NS
F. #2016R01322

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                              Docket No. <u>17–CR–281 (ERK)</u>

CARLOS RICHARD MARTINEZ,

             Defendant.

– – – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN <u>OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTION</u>

                                    RICHARD P. DONOGHUE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

Nadia I. Shihata
Assistant U.S. Attorney
    (Of Counsel)

1

<u>INTRODUCTION</u>

The government respectfully submits this memorandum of law in opposition to the defendant Carlos Richard Martinez's post-trial motion, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial.  The defendant was convicted, following a jury trial, of all 20 counts of the Indictment.

The defendant now moves for a new trial, arguing that the government withheld material information in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See generally</u> Defense Declaration dated November 29, 2018 ("Defense Decl.") and Memorandum of Law in Support of Defendant's Rule 33 Motion for a New Trial ("Defense Memo").  For the reasons set forth below, the defendant's motion should be denied.

<u>BACKGROUND</u>

I.      <u>The Indictment</u>

On May 24, 2017, a grand jury in the Eastern District of New York returned a 20-count sealed indictment charging the defendant with (1) five counts of deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242; (2) five counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1); (3) five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); and (4) five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b).

II.     <u>The Trial</u>

    A.      <u>The Evidence</u>

At trial, the government presented the testimony of 16 witnesses and entered over 100 exhibits into evidence.  The defense presented the testimony of one witness:

Matthew Kluger, the victim's former criminal defense lawyer.  The trial evidence established the following facts.

On March 2, 2015, following her sentencing on a drug conspiracy charge, Maria[1] was transferred from the Manhattan Correctional Center ("MCC") to the Metropolitan Detention Center in Brooklyn, New York ("MDC") and housed in Unit 6 South of the MDC's East Building – a unit that housed sentenced female prisoners.  (T.57-59, 726, GX200)  She was released from the MDC on April 29, 2016.  (T.58, 726, GX200)  As a sentenced inmate, Maria was required to work at the MDC.  Initially, she worked doing laundry for the unit, then in the unit kitchen.  (T.67-68)  In approximately May 2015, she began to work regularly as a cleaner who cleaned areas on the second floor of the MDC's East Building, including the medical area, the legal department area and the Lieutenants' area.  (T.68-69, 552, 630)  Maria generally cleaned several times a week, whenever she was called upon to do so.  (T.68-69)  When Maria first began working as a cleaner, she generally cleaned with inmates Odis De La Cruz and Carmen Lopez.  (T.69, 439, 442, 630, GX8)  Carmen Lopez left the MDC on November 1, 2015.  (T.69)  Odis De La Cruz remained at the MDC after Maria left.  (T.70)  Odis De La Cruz generally cleaned with Maria on the second floor unless she had a visit.  (T.70)

As a general matter, Maria learned she needed to clean the second floor on a particular day from the assigned unit officer, who called her last name out over the loud speaker, after which the officer told Maria to get ready as another officer would come to take her to the second floor to clean.  (T.70-71, 478-79)  Apart from Officer D'Anello Smith, the

---

[1] The victim testified at trial using the pseudonym "Maria."

escorting officer left after escorting Maria to the second floor and turning her over to the Lieutenant who had called for a cleaner.  (T.78-79, GX3)  During her time at the MDC, Maria was called to clean the second floor by a number of Lieutenants, including the defendant, Lt. Carlos Martinez, and Tomas Rodriguez, when he was assigned as a temporary lieutenant.  (T.79, 477-78, GX1)  Rodriguez testified that when Maria cleaned for him, "[s]he would just do her job normally and then she would leave."  (T.478)

Maria first met the defendant while cleaning the Lieutenants' Office for Lt. Almos, while Lt. Almos and the defendant were both inside.  (T.80)  Thereafter, in approximately September or October 2015, Maria began cleaning the Lieutenants' Office area, including the bathrooms, for the defendant.  (T.81)  The defendant generally had Maria clean for him on Fridays, Saturdays or Sundays.  (T.82)  On Fridays, the defendant called for Maria after 4:30 or 5 p.m.  (T.82)  On the weekends, he generally called for her between 11 am and 1 pm  (T.82)  On Friday afternoons and evenings, as well as on the weekends, the second floor was generally empty, apart from the lieutenant and the escorting officer.  (T.82, 477)

The defendant and Maria spoke to each other in Spanish.  (T.87)  When Maria first began cleaning for him, the defendant was nice to her.  (T.87-88)  He told Maria about himself, including that he had daughters, one of whom was almost Maria's age and who had a son, and two others who were younger from a different mother, who worked security at a medical facility, that he lived in staff housing about 10 minutes away from the MDC, and that he was divorced.  (T.88, 375)  The defendant referred to Maria by her first name, which was unusual, as officers and lieutenants at the MDC usually referred to inmates by their last names.  (T.88)  Eventually, the defendant's conversations with Maria began to make her

3

uncomfortable.  (T.92)  While in the Lieutenants' Office, as Maria was retrieving cleaning liquids from one of the cabinets, he asked her "how do you satisfy your body"?  (T.93). Maria responded, "I beg your pardon" and the defendant again asked how she satisfied herself, indicating "we're all adults here[;] don't be embarrassed."  (T.93)  The defendant further told Maria that she "should play with [her]self" while thinking about him when she went back to her unit.  (T.93-94)  Maria told the defendant she was married.  (T.94)  The defendant then commented that Maria's husband loved her so much that he had not come to visit her at the MDC.  (T.94)  As a Lieutenant, the defendant had access to Maria's visitor records.[2]  (GX227)  These sexual comments made Maria feel "embarrassed" and "ashamed." (T.94)  She did not want the defendant to make these comments to her or to discuss these matters with him.  (T.94)

---

[2] Those records showed that Maria only had one visit during her entire stay at the MDC, which occurred later – on January 31, 2016 – with Noel Lopez, discussed further below.  (GX205)

1.      The December 13, 2015 Incident[3] (Counts 1 – 8)

On Sunday, December 13, 2015, the defendant worked as the East Activities Lieutenant on Day Watch shift 4, from 8 am to 4 pm.  (T.746-47, 856-57; GX241)  The next shift the defendant worked was as the East Activities Lieutenant on the Morning Watch Shift 1, from midnight to 8 am on December 14, 2015.  (T.717, 857, GX241)  The East Activities Lieutenant is "in charge of" the East Building, including the Special Housing Unit ("SHU"). (T.748-49, 789)

On December 13, 2015, the defendant was in Maria's unit at 10:10 am doing "PREA rounds."  (GX208)  Around 11 am or 12 pm, an officer escorted Maria to the second floor to clean for the defendant.  (T.100-01)  While Maria did not recall whether Odis De La Cruz came with her to clean the second floor that day, MDC visitor records showed that two visitors came to see Odis that day at 11:42 am and 11:45 am, respectively.  (T. 101, 125, 738-39, GX8, GX235)  After escorting Maria to the Lieutenants' Office (where the defendant was), the officer left.  (T.101)  After entering the Lieutenants' Office, Maria went to an area near the Lieutenants' desk – underneath the side desk with the printer on it – where

_____

[3] The government proved the date of this incident at trial through a combination of evidence.  Multiple witnesses, including Maria, testified that the incident occurred the day Melva Vasquez was able to have a visit for the first time in six months, following the lifting of a disciplinary sanction she received.  (T.99-100, 466, 555)  The trial evidence established that the incident for which Melva received a disciplinary sanction took place on May 23, 2015, that she was first housed in the Special Housing Unit ("SHU") for two weeks from May 23, 2015 to June 3, 2015 and then lost her visiting privileges for 180 days for "unauthorized physical contact with female," starting June 8, 2015 until December 4, 2015. (T.443-46, 727-28, 739-740, GX202, GX222) Melva testified that, after the visitor sanction was lifted, a visitor came to the MDC to visit her one day, but Melva was not authorized to see her so the visitor returned the following day and visited with Melva.  (T.446)  Visitor records showed a visitor was logged into the MDC system to see Melva on December 12 and 13, 2015; the last visitor logged for Melva prior to that was on June 6, 2015.  (T.737-38; GX210)

Lt. Veronica Metzger had previously stored certain cleaning supplies.  (T.101-02, 792, 798-99, GX103C)  Maria went there to "get the sprays," specifically to pour "pure spray into another container" that she could add water to.  (T.102)  The defendant was seated on the chair behind the Lieutenants' desk at the time.  (T.102)  While Maria was crouched down preparing the cleaning supplies, the defendant swiveled his chair around to Maria; she looked up and observed the defendant's erect penis out through the fly of his pants.  (T.103)  The defendant then grabbed Maria's head and shoulder with his hands to push Maria towards his penis and get his penis inside her mouth.  (T.103)  Maria put her hands on the defendant's knees in an effort to push herself away from him, but hit her head on the edge of the desk with the printer on it.  (T.103-04)  The defendant told Maria she was not going to get in trouble because his computer had access to all the cameras.  (T.104, GX103(f))  Ultimately, the defendant inserted his penis inside Maria's mouth.  (T.103)  The defendant then stood Maria up and put her chest-down on the Lieutenants' desk, pulled her pants down and penetrated her vagina from behind with his penis.  (T.105-06)  While this was happening, Maria was crying and asked the defendant to use "protection," but the defendant did not do so.  (T.106)  The defendant moved Maria to the area to the right of the Lieutenants' desk, "where he finished" and took his penis out of Maria's vagina.  (T.106-07)  During this encounter, Maria was scared.  (T.107)  Maria did not want the defendant's penis in her mouth or to have sex with the defendant.  (T.107)  The defendant forced her to do so and she felt like she had no choice. [4]   (T.107)

---

[4] Maria is five feet tall and weighed approximately 138 pounds when she was housed at the MDC.  (T.107-08)  The defendant was taller, bigger and stronger than her. (T.108; GX213)

After he finished, the defendant told Maria she was bleeding and commented "that's what happens. Well, I turned a girl into a woman." (T.108) Maria "asked [the defendant] when he was finished where the semen was" and the defendant told her that "he came inside of [her]." (T.108) Worried she might get pregnant, Maria asked the defendant to get her the morning-after pill. (T.108-09) The defendant refused to do so and eventually informed Maria that he had undergone a vasectomy and so could not impregnate her. (T.109-10) Medical records confirmed that the defendant had, in fact, undergone a vasectomy in August 2013 at Maimonides Medical Center.[5] (T.650, GX215) Maria was "very upset" and was crying and begging him for the pill. (T.109) To calm her down, the defendant reluctantly agreed to get Maria the morning-after pill and said he would try to come by Maria's unit around midnight to give it her. (T.109-10) At some point after the defendant had sex with her, Maria went to women's bathroom in the area outside the Lieutenants' Office. (T.110-11) While inside, Maria noticed she was bleeding from her vagina. (T.111) Maria did not have her period that day. (T.108)

The defendant told Maria not to tell anybody what happened, that she would have "a problem" if she did so, and that she would serve more time in prison. (T.111-15)

2.     The Aftermath of the First Incident

Thereafter, an officer arrived to escort Maria back to her unit, as was the usual procedure for inmates taken out of their housing unit for cleaning details. (T.115) Maria arrived back in Unit 6 South sometime between 2:40 pm and 3:30 p.m. (T.115) Maria went

---

[5] As expert witness Dr. Jonathan Vapnek testified, a man who has undergone a vasectomy still ejaculates and his semen is virtually unchanged, with the exception of the fact that there's no more sperm. (T.649)

to the bathroom area in the unit and called out to Kiara Maldonado, a young inmate who was approximately 21 or 22 years old at the time, who then came into the bathroom area.  (T.115-17, 632, GX6)  Kiara then met Maria in the area in front of the toilet stalls.  (T.118, 632, GX104D)  Maria looked "freaked out."  (T.633)  Maria told Kiara that the defendant "penetrated" her, which Kiara understood to mean that the defendant and Maria had sex.  (T.118-19, 634-35)  Kiara reacted "[l]ike it was something, you know, happy.  Like it was something good."  (T.119)  Maria was upset by Kiara's reaction, but did not say anything to her about it.  (T.119)  Maria then went into one toilet stall, while Kiara went into the stall next to hers, because Maria thought that the defendant might be watching her as there was a security camera that captured the area in front of the toilet stalls.  (T.119, 632-34, 787)  The two continued talking to each other while in adjoining stalls.  (T.119, 633-34)  Maria told Kiara that every time she "wiped [her]self [she] was still bleeding."  (T.119, 634)  Kiara then went back to her bed.  (T.635)

Thereafter, Maria spoke with two other inmates who had returned from having visits, Danilda Lora Osoria (also known as "Nani") and Melva Vasquez, along with Kiara, in the area near Danilda's bottom bunk in row 15.[6]  (T.119-21, 447, 558, 636, 737-39, GX4, GX5, GX104B, GX201, GX209, GX210)  Maria appeared sad, nervous and was fidgeting; she was anxious and it seemed like "[t]here was something in her that she wanted to get out."  (T.559, 636)  Danilda had never seen Maria like this before.  (T.559)  Maria told them that the defendant had penetrated or "stuck it in" her and that he did not care that she had bled,

---

[6] The women testified that they congregated near Danilda's bed because she was the only one of them who had a lower, rather than an upper, bunk at the time, which was confirmed by MDC records.  (T.726-28, GX200-203)

and that she gave the defendant oral sex.  (T.122, 559, 563, 636)  Melva recalled that Maria

was crying and that she said that she had sex with the defendant, she had bled, and the

defendant did not use protection.  (T.447-48, 560, 563-64)  Danilda's initial reaction was to

not take the situation seriously (T.448, 560); she said, in substance, "hey, we're in jail.  So

like what woman doesn't want a piece of dick."  (T.122)  She took it "just like Kiara."

(T.122)  Kiara "thought it was funny at first, but then as she started like telling the story she

started like really crying and stuff, so [Kiara] felt bad after."  (T.636)  Danilda's reaction

made Maria feel bad and she told Danilda "it's not the same thing," but Danilda just

responded, in substance, "just take it easy.  Calm down.  What are you crying about?  You're

a woman."  (T.122, 561)  Maria "was looking to [Danilda] for support [but Danilda] didn't

know how to give her that."  (T.561)  Melva reacted differently; she was angry.  (T.122, 448)

   After this conversation, Maria went to her bed, but she was not able to sleep

because she "couldn't stop crying." (T.123)  At some point, she left her bed and went back to

the area near Danilda's bed.  (T.123, 561-62)  Maria was crying and even more upset than

earlier.  (T.123, 562)  At this point, Danilda and Kiara took her more seriously.  (T.123, 560-

61)  Maria said that at one point "she crouched down to get the chemicals to clean with, and

as she was about to turn the lieutenant had his penis out."  (T.562)   She also said that the

defendant has ejaculated inside of her and that she had asked him for the morning-after pill

and he told her he was "going to try to come tonight" (T.124, 564, 637)  Maria also told

Melva that the incident transpired in the Lieutenants' Office and that the defendant had

access to "a camera so that he could check and see whether or not someone was coming."

(T.449)  At some point, Maria went to the bathroom again.  (T.124, 562)  While in the

bathroom, she called out for Danilda because she was still bleeding and wanted a sanitary

napkin.  (T.124, 563)  Danilda came to the bathroom area and Maria asked her for a sanitary

napkin, which Danilda subsequently brought her.  (T.124, 563)

During her interactions with Danilda, Melva and Kiara the day of the first

incident with the defendant, Maria did not tell them all of the details of what transpired in the

Lieutenants' Office.  (T.126)  Maria also did not tell any prison officials what transpired

because she "didn't want any problems, [she] didn't want to be there a single day longer."

(T.137) and "no matter what the circumstances are, I'm a criminal.  He's a man, he's a man

who has a certain position.  Who's going to believe a criminal compared to a person who has

a position, who has his life?" (T.138)

At 9:29 p.m. on December 13, 2015, the defendant purchased one "Plan B,

One-Step, one count" pill over the counter for $44.99 using his USAA debit card  and his

Rite Aid Wellness Rewards card, receiving a $5 discount, at a Rite Aid store located at 6423

Fort Hamilton Parkway in Brooklyn, between his home and the MDC.  (T.468, 530-31,

GX214, GX218, GX242, GX243)

At approximately 12:30 am on December 14, 2015, Maria saw the defendant

in Unit 6 South.  (T.126-27; GX242)[7]  Kiara also saw the defendant come to the unit at that

time.  (T.638)  Maria was sitting on her bed, which was on a top bunk in the 17th row.

(T.127, GX104A)  Maria first saw the defendant as he entered the unit.  (T.128, GX104C)

After the defendant entered the unit, he gestured to Maria with something in his hand.  Maria

had been waiting for the defendant that night because he told her earlier that he would try to

bring her the morning-after pill.  (T.130)   Maria then walked over from her bed to the

---

[7] MDC records showed that the defendant conducted "PREA rounds in Unit 6 South
as 12:19 am on December 14, 2015.  (T.864-65, GX242)

defendant, who was in the area by the ice machine, near the guard's office at the time.

(T.130-32, 638, GX104E)  The defendant then gave Maria a copy of her MDC identification

(printed on a piece of paper) inside a plastic cover and told her "it's inside," referring to the

morning-after pill, while the unit officer was in the area.  (T.130-32, 639-40)  Maria then

heard the defendant tell the unit officer that Maria had forgotten her ID when she was

cleaning downstairs, which was not true.  (T.132)  After receiving the ID in a plastic cover

with the morning-after pill inside, Maria returned to her locker by her bed to get a cup and

then went to the ice machine to obtain ice and water.  (T.132)  She then went to the bathroom

area and inside the small room in the back with a sink.  (T.133; 638, GX104D)  There, Maria

retrieved the folded packaging of the morning-after pill, unfolded it, got the pill out and took

it.  (T.133-34)  Maria then returned to her bed, keeping the packaging the pill had come in so

that Danilda could read it to her after Danilda returned to the unit from her overnight job

shift in the MDC's kitchen, which generally began at 10:30 or 11 pm and continued until

anywhere between 3 and 6 am.  (T.134-35, 547-48)  Maria wanted Danilda to read what was

written on the packaging because it was in English and Danilda knew and could read

English.  (T.135, 566)

        When Danilda returned to Unit 6 South from her work shift, Maria showed her

the pill packaging in the bathroom area and asked Danilda if it was, in fact, the morning-after

pill.  (T.136, 565-66)  Melva was also present.  (T.136, 450)  Danilda read the packaging and

confirmed it was the morning-after pill.  (T.136, 566)  Melva instructed Maria to get rid of

the packaging.  (T.450)  Maria flushed the packaging down the toilet, so she would not get in

trouble for having contraband in the prison.  (T.136-37, 451)  Later that day, Maria told

Kiara she was worried about getting in trouble because the defendant told her that "he'll take

her to the SHU and give her more time" and Maria told Kiara not to tell anyone what had happened.  (T.636-37, 640)

Just days later, on December 16, 2015, Melva left the MDC.  (T.727; GX202) Shortly thereafter, on December 21, 2015, Kiara also left the MDC.  (T.728, GX203)  In the week before she left the MDC (which was also the week immediately following the December 13, 2015 incident), Kiara noticed a change in Maria.  (T.640)  Kiara testified that Maria was not socializing and "she didn't want to go to work[;] [s]he was always in bed." (T.640)

3.    Other Incidents and Maria's Efforts to Stop the Defendant

Following the December 13, 2015 incident, the defendant continued to call Maria to clean the Lieutenants' Office and continued to rape her by penetrating her vagina with his penis while in the Lieutenants' Office multiple times; though Maria could not recall the exact number of times, she recalled it occurred "at least" ten times.  (T.138-39, 161-62) Each time, the defendant used the computer on the Lieutenants' desk to monitor the video feeds from security cameras to ensure no one was coming.  (T.163)[8]   After the first incident,

---

[8] As Officer Nicole Pappadio testified, the defendant did the same while engaging in consensual sexual activity with her while on duty in the Lieutenants' Office in November 2015.  (T.697-703)  The defendant suggested to Pappadio that they have sex in the Lieutenants' Office "[b]ecause of the camera system that he had access to" through the computer monitor on the desk in the Lieutenants' Office.  (T.698)  Indeed, on November 18, 2015 at 7:22 am, while both he and Pappadio were on duty, the defendant sent an email to Pappadio stating "I was going to have you come this morning here, but the video system on the computer system is down."  (T.699-700, GX216)  Pappadio understood that "the video cameras weren't working in that area and he would not be able to watch the videos" so he was not going to have her come meet him.  (T.699-700)  Special Agent Laura Riley testified that she accessed the camera system from the same computer in the Lieutenants' Office as part of her investigation.  (T.850)  She was able to view a 16-grid screen, which showed a multi-view of areas located on the second floor of the East Building, with the ability to also choose to show just one camera on the screen.  (T.850-53, GX103(f); GX103(g); GX103(h))

Maria asked the defendant for the morning-after pill again, but he did not bring it to her.

(T.139)  Prior to Danilda's departure from the MDC on March 18, 2016, Danilda saw Maria

after these incidents.  (T.567)  Maria appeared "tired of going downstairs" and was upset that

she had to go to the second floor for the defendant.  (T.567)

(a)     The Incident Where Officer Smith Was the Escort Officer[9]
        (Counts 9 – 12)

During the period between July 2015 and December 2016, Officer D'Anello

Smith was periodically assigned as the East Internal Officer, working the Day Watch 4 shift

from 8 am to 4 pm and reporting to the East Activities Lieutenant.  (T.664-65)  The

defendant was among the East Activities Lieutenants Officer Smith worked for in that time

period. (T.665)  Officer Smith's duties as East Internal Officer included transporting inmates

within and outside the MDC and generally assisting the East Activities Lieutenant as

necessary.  (T.657-58, 664, 749, 789-90)  In this role and during this time period, Officer

Smith escorted female inmates to clean the second floor of the East Building, including the

Lieutenants' Office area.  (T.667)  Officer Smith particularly recalled escorting two female

inmates to the second floor to clean during this time period, "[o]ne was an older Hispanic

lady and the other was a younger Hispanic lady."  (T.668)  Maria was the younger inmate

who Officer Smith escorted to clean the second floor.  (T.139-40, 668, GX3)  Officer

---

The defendant was also able to access cameras from other floors of the MDC using this
camera system, including in Unit 6 South.  (T.852)

[9] Maria testified this incident occurred after the first rape on December 13, 2015 and
before the Facebook call described below.  The evidence showed this incident took place on
one of three possible days when Officer D'Anello Smith was assigned as East Internal
Officer and the defendant was assigned as East Activities Lieutenant during the same shift:
January 16, 2016, January 30, 2016, or February 6, 2016.  (GX207, GX225)

13

Smith's practice was to supervise the inmates as they cleaned the second floor unless he had an immediate assignment.  (T.668)  If he had another assignment to do, Officer Smith would leave the inmates in the custody of whoever was present at the time – either another officer or the lieutenant.  (T.668-69)

Officer Smith escorted Maria to the second floor to clean for various lieutenants approximately ten times.  (T.669-70)  Officer Smith observed that she "wasn't talkative.  She came down.  She did what she was ordered to do.  She did her assignment.  And there wasn't much talking, much of anything.  She just came down and did what she was, you know, assigned to do."  (T.670)  She did not cause any problems.  (T.670)

Officer Smith escorted Maria to the second floor for the defendant approximately three times.  (T.140, 670)[10]  Maria recalled that Officer Smith was the one escort officer who generally stayed on the second floor with her while she was cleaning, except for one time when he left Maria alone with the defendant in the Lieutenants' Office area.  (T.140)  It was either a Friday, Saturday or Sunday.  (T.140-41).  On that particular day, Officer Smith escorted Maria from Unit 6 South to the Lieutenants' Office.  (T.141)  When they arrived, the defendant was inside the Lieutenants' Office.  (T.141)  Maria began cleaning – taking out the trash and sweeping the area in front of the bathrooms.  (T.141, GX102A-B)  She then began cleaning the bathrooms.  (T.142)  While cleaning the bathrooms, Maria heard the defendant ask Officer Smith to do him a favor, to which Officer Smith responded, "sure, . . . of course."  (T.142)  Maria next saw Officer Smith leave, exiting

---

[10] MDC records confirmed that there were three occasions between December 13, 2015 and February 7, 2016 when the defendant worked as East Activities Lieutenant and Officer Smith worked as East Internal Officer during the same shift:  January 16, 2016, January 30, 2016 and February 6, 2016.  (T.859-61; GX207, GX225)

the door out of the Lieutenants' Office area.  (T.142-43, GX102B)  The defendant was

Officer Smith's superior and, as the East Internal Officer, it was Officer Smith's

responsibility to do any tasks assigned to him by the defendant as East Activities Lieutenant.

(T.671-72)

After Officer Smith left, the defendant then called Maria by her first name

from the Office.  (T.143)  Maria did not respond or go to the Lieutenants' Office.  (T.143)

The defendant then came to the door of the bathroom that Maria was cleaning and said,

"walk, I don't have a lot of time."  (T.143-44)  The defendant told Maria that he had sent

Officer Smith to the West Building and that it would take Officer Smith 20 minutes to go

there and come back.  (T.144)  The East and West Buildings of the MDC are connected

through "a link or a tunnel" that allows an individual to go from one building to the other

without going outside.  (T.661, 717, 790-91)  There are approximately six locked metal doors

operated by the control room that one must cross to get from one building to the other.

(T.672, 717)  Each door must be unlocked by the control room to grant access to the

individual who wishes to pass through once they are recognized as authorized through a

camera system. (T.672-73, 717)  Sometimes it takes time for the control room to unlock the

doors, depending on what else is happening.  (T.673)  It can take 20 minutes to walk from

one building to the other and back.  (T.717)

The defendant was angry because Maria had not come when he called her

name.  (T.145)  He then turned around and Maria followed him towards the Lieutenants'

Office.  (T.144-45)  She had a mop in her hands at the time and, as she followed the

defendant, she raised the mop as if she were going to hit the defendant while his back was

towards her, but did not actually hit him.  (T.145-46)  She knew she "would have gotten a lot of time" for hitting a lieutenant.  (T.146)

Once the two of them were in the Lieutenants' Office, the defendant grabbed Maria and groped her in front of the Lieutenants' desk, putting his hand in her vagina. (T.146-47, GX103C).  The defendant turned the computer monitor on the desk toward him; it displayed multiple video feeds from various cameras on the second floor.  (T.147-48)  The defendant then moved Maria to the right side of the Lieutenants' desk where he had a better view of the computer monitor since he was unable to turn it all the way.  (T.148)  The defendant then pushed Maria's body so that her chest was on the desk, groped her, pulled down her pants and penetrated her vagina with his penis from behind.  (T.148)  Maria felt "powerless, miserable.  [She] would rather have been killed."  (T.149)

After the defendant finished, Maria went to the bathroom to try to get his semen out of her and to wash herself off.  (T.159-60)  While she was in the bathroom, Officer Smith returned to the Lieutenants' Office area.  (T.160)  Thereafter, Officer Smith escorted Maria back to Unit 6 South.  (T.160)  Maria did not tell Officer Smith what happened because he was an officer under the defendant's command and she just wanted her time to end and "to get out of that hell hole."  (T.160-61)

(b)      The January 2016 Incident (Counts 13 – 16)

On one occasion in January 2016, an officer escorted Maria and Odis De La Cruz to the second floor to clean.  (T.165-66; GX8)  The officer took Maria and Odis to the entrance to the Lieutenants' Office, where the defendant was, and then left.  (T.166)  Maria left Odis at the doorway to take the trash out of two trash cans in the hallway outside the Lieutenants' Office area.  (T.166-67, GX101D)  Maria then checked if the door to the dental

office was open so she could clean it, but it was locked.  (T.168)  Maria then returned to the

Lieutenants' Office.  (T.168)  Odis was still there, speaking with the defendant.  (T.168-69)

Maria did not want to be in the Lieutenants' Office because she knew the defendant would

rape her again, so she asked the defendant if he could go to control to get the keys to the

dental clinic so she could clean it.  (T.169)  The defendant refused.  (T.169)  Maria then went

to a small room in the hallway outside the Lieutenants' Office area to get a mop and a bucket

of water before returning to the Lieutenants' Office area.  (T.170-71, GX101D)  Odis

indicated she was going to clean the area by the Legal Department, which was located at the

other end of the hallway, and that Maria should clean "here."  (T.171-72)  Odis then left the

Lieutenants' Office area and Maria began cleaning.  (T.172)

       Maria entered the Lieutenant's Office and the defendant was inside.  (T.173)

Maria began walking to the area where Lt. Metzger had stored cleaning liquids under the side

desk with the printer on it, next to the Lieutenants' desk.  (T.173-74, GX103C)  The

defendant was seated at the desk.  (T.174)  As Maria walked towards the cleaning supplies,

behind the Lieutenants' desk, the defendant turned in his chair and stuck his arm out to block

Maria's way.  (T.174-75, GX103C)  Maria pushed the defendant's arm down, but he put it

back up and then pulled Maria towards him, at which point Maria hit his head with her hand.

(T.175-76)  Maria hit the defendant because she "didn't want him to grab [her].  [She] didn't

want him to rape [her] again.  [She] was so tired of the same thing happening over and over

and over again."  (T.176)

       After Maria hit him, the defendant stood up – angry – and said, in substance,

"you know how much time you could get for hitting a lieutenant, don't you."  (T.176)  He

then grabbed Maria, turned her around, put her chest against the desk, and twisted her arm

behind her back, raising it up.  (T.177-78)  Maria said it hurt and he then let go of her arm.

(T.177)  The defendant then touched her vagina, "pressing in hard with his fingers."  (T.178)

He then lowered Maria's pants and penetrated her vagina with his penis from behind.

(T.178)  While the defendant was penetrating Maria, he said "wait a minute" and did

something on the computer to that the monitor only showed the video feed from one camera,

which depicted the area where Odis was cleaning.  (T.179)

> During this encounter, Maria was scared and felt "horrible."  (T.178-79)  As

she explained:  "At that point I was so, so tired.  There was nothing for me to do at that

point."  (T.178)  After the defendant finished, Maria went to the bathroom and again tried to

get his semen out of her and washed herself.  (T.180)  When Maria exited the bathroom, she

saw that Odis had returned to the Lieutenants' Office area.  (T.180)  Odis noticed that Maria

had not finished cleaning, so the two then cleaned the area together.  (T.180)  Thereafter, an

officer came to escort Maria and Odis back to Unit 6 South.  (T.180)

>> (c)      Maria's Efforts to Stop the Defendant

>>> i.      January 31, 2016 Visit by Noel Lopez

> In an effort to make the defendant stop sexually abusing her, Maria called her

friend Noel Lopez, asked him to come visit her, and told him to kiss her when he came for a

visit.  (T.181, 186, 304-05)  She did so because the defendant had commented to Maria that

she was alone and no one visited her at the MDC.  (T.181)  Maria wanted Noel to visit so

that the defendant "would see that [she] had one person at least."  (T.181)  On the phone,

Maria "sounded nervous, scared, afraid and she sounded like she needed to talk to someone."

(T.304)  Noel agreed to visit Maria at the MDC and filled out the necessary paperwork to get

approved to do so.  (T.182, 305)  Once approved, Noel visited Maria on January 31, 2016 at

approximately 11:56 am and visited with her for approximately three hours.  (T.306, 735-36; GX205)  Notably, the defendant worked as the East Activities Lieutenant on January 21, 2016 from 8 am to 4 pm.  (T.857, GX241)  During the visit, Maria was at first happy to see Noel, but then seemed "sad," "lonely," and "desperate."  (T.306, 311)  Maria again asked Noel to kiss her on the lips when he came to visit her, which Noel did, though he found it odd since Maria was just his friend, not his girlfriend.  (T.184, 186, 306)[11]  Maria was hoping that the defendant would stop raping her if he saw that.  (T.184)  But after Noel's visit, the defendant did not stop and things got worse.  (T.184)  The defendant told Maria, "if that's what you want, I'll kiss you" and began grabbing her and kissing her.  (T.185)

ii.    The Facebook Call with Larihelys Vargas

The defendant told Maria he would be "different" when she got out of prison and told her she should get in touch with him when she was released, providing her with his email address Carlos.Rich.Martinez@gmail.com.  (T.185-87, 842-43 GX211)  Maria told the defendant "When I get out of here, I don't want to hear from anybody and certainly not you. You are the last one I want to hear from when I get out."  (T.188)

Maria knew inmate phone calls at the MDC were recorded and monitored. (T.189)  On February 7, 2016 at 1:44 pm, Maria called Larihelys Vargas, a friend she previously worked with cleaning hotels, and asked her to go on Facebook, unfriend Maria, and look the defendant up on Facebook.  (T.190, 289, 291-92, GX204)  Maria provided Larihelys with the name "CarlosRichMartinez" to do so.  (T.190, 291)  Maria did this,

---

[11] Notably, Noel testified that when he first met with the government he did not tell the truth about Maria asking him to kiss her when he visited because he was "married and [he] felt this was going to cause [him] an issue."  (T.307)

hoping the defendant would listen to the call, hear her conversation with Larihelys, and get worried and stop sexually abusing her.  (T.190)  The defendant's Facebook account name is "Carlos Rich Martinez."  (T.608-09; GX213)  Larihelys found the defendant's Facebook page.  (T.190, 292)  Maria told Larihelys that the defendant was a "boss" or guard at the MDC.  (T.190-91, 291)  Larihelys then described some of the photographs on the defendant's Facebook page.  (T.191, 292-93)  Maria recalled that, during a conversation with Larihelys, Larihelys asked Maria if the defendant "kissed" her.  (T.317)  Maria responded "yes" and Larihelys asked "all the way?", using a Dominican slang term "chiqui, chiqui," to which Maria responded "yes."  (T.317)  At 1:53 pm, Larihelys sent the defendant a friend request and, later that day, corresponded with the defendant via Facebook messenger.  (T.292, 614-16, GX213, GX300)

       The TruPhone system records all inmate phone calls and keeps the calls for 180 days (six months), after which the calls are deleted or written over, unless a call is saved for a specific purpose by an individual physically "lock[ing]" the call, a procedure that can be done by SIS officers.  (T.729-30, 472-73)  The TruPhone system captures the number the inmate dialed, the date and time the call was made, and the length of the call.  (T.473, 730-31)  The system also captures which staff member, if any, monitored a particular call (through the unique "TF" number the staff members used to log onto the system) and on what date and time the monitoring took place, as well as the duration of the monitoring.  (T.474, 731-32)   Inmates are aware that their calls are monitored.  (T.473)

       On February 8, 2016, SIS Officer Tomas Rodriguez listened to recorded calls made by Maria to Larihelys Vargas on [dates] using the TruPhone system.  (T.473-74, 478; GX204).  The calls were in Spanish and Officer Rodriguez speaks Spanish.  (T.478)  At the

time, Officer Rodriguez's official title was that of "SIS Technician."  (T.470-71, 482)  In that capacity, Officer Rodriguez investigated prisoner infractions, monitored inmate prison calls and electronic correspondence, and read inmate mail.  (T.471)    At 9:37 am, Officer Rodriguez listened to an "odd call" where Maria asked her friend "to do her a favor," namely to "look up some information" about somebody "inside," i.e., in the prison, on Facebook and spelled out the defendant's name, which caught Officer Rodriguez's attention.  (T.478-80) Officer Rodriguez recalled Maria asking her friend to "[f]ind out if he was married.  If he was with somebody, a woman, a girlfriend.  Find out."  (T.480)  Officer Rodriguez has known the defendant since he first started working at the Bureau of Prisons in November 2001 and Officer Rodriguez respected and looked up to the defendant, who had a higher rank than him.  (T.471, 480-82)  Officer Rodriguez lived in the same staff housing complex as the defendant and knew the defendant's wife.  (T.482)  After listening to this call, on February 8, 2016 at 10:06:25 am, Officer Rodriguez called the defendant on his cell phone (718-490-8719) using the phone at the SIS office with telephone number 718-840-5129, which appears as 718-840-5000 on phones receiving his calls.  (T.482-84, 843-47, GX212A, GX212B; GX228, GX300)  The call was over nine minutes long.  (T.846, GX212B)  Officer Rodriguez told the defendant that he had been monitoring a call made by Maria and that she was trying to get information about him on Facebook.  (T.485)  The defendant responded, "are you sure?", to which Officer Rodriguez responded "Yes.  If you don't believe me, listen to the call."  (T.485)  At 10:10 am, Officer Rodriguez then played the call for the defendant.  (T.485, GX204)  After listening to the call, the defendant stated, "oh, shit.  I'm not going to bring these women down anymore.  I don't want problems."  (T.485)  When he said, "oh shit," the defendant sounded surprised and scared.  (T.485)  At 10:21:02 a.m., Officer

Rodriguez called the defendant on his cell phone again.  (T.846; GX212B; GX300)  That call lasted 77 seconds.  (T.846; GX212B)

   In interviews with the government, Officer Rodriguez initially hid information from the government.  (T.521)  Initially, he incorrectly stated that he had not told the defendant about this call or that Maria was the inmate who made the call.  (T.486-87)  He also initially did not tell the government that he had played the call for the defendant.  (T.487)  Officer Rodriguez withheld this information from the government because he was concerned that he "would be called a rat and that [he] would have problems at work."  (T.487, 521)

   Sometime after playing the call for the defendant over the phone, possibly the same day, Officer Rodriguez spoke to his supervisor, Timothy Geier, about the call.  (T.487, 496)  More specifically, Officer Rodriguez told Mr. Geier that "there was an inmate who was trying to get information from [the defendant's] Facebook page."  (T.488)  Mr. Geier told Officer Rodriguez to talk to Maria, which he did, as set forth below.  (T.488)

   On February 9, 2016, Maria saw the defendant in Unit 6 South sometime between midnight and 1 am.  (T.192, GX209)[12]  The defendant was working as East Activities Lieutenant on the Morning Watch shift from midnight to 8 am.  (T.857-58, GX241)  Danilda also saw the defendant in the unit at this time.  (T.568)  The defendant arrived and went straight into the unit office.  (T.194, 569)  Maria was in her bed when the

---

[12] MDC records showed that the defendant logged that he conducted "PREA rounds" in Unit 6 South at 12:43 a.m. on February 9, 2016.

unit officer (Officer Raymond King) told her that the defendant wanted to speak with her.[13] (T.192-93, GX10)  Maria got ready and then went to the unit office.  (T.194, GX104E)  Odis De La Cruz also went to the unit office.  (T.194, 570).  Odis went into the unit office first and spoke with the defendant while Maria and the officer remained outside the unit office. (T.194, 570)  After a couple of minutes, Odis exited the unit office and Maria went in. (T.194-95, 570)  The defendant was angry and said, "what did you do, idiot?  What did you do, you damn idiot?  What are you doing?" and asked "why did you do that?", referring to her call with Larihelys Vargas.  (T.195-96)  Maria responded, "I am so tired.  I am so tired.  I just don't know what to do at this point."  (T.195)  The defendant then told Maria that she was "in an investigation now" and that people were "going to come and investigate you now."  (T.196)  The defendant told Maria she could "get more time" as a result of the investigation.  (T.197)  At this point, Maria had about two to three months left on her sentence.  (T.197-98)  She was scared and told the defendant she did not want any problems. (T.197-98)  The defendant told Maria to lie to "jail detectives" who would come to speak to her and tell them that she "saw [his] email on the computer screen" or "on some piece of paper on the floor or something."  (T.196)  Maria felt "bad" after this conversation.  (T.198) What she had "wanted was [for the defendant] to hear [the call] and stop.  [She] didn't want to get [her]self in an investigation."  (T.198)  She "didn't want to get into trouble" and "sent to the SHU," which she described as "a punishment room where you have a little bed. There's no space for anything.  They give you your food as if you were a dog and get taken out twice a week to wash."  (T.198, GX245(c), GX245(d))

---

[13] Officer Raymond King began his shift as the unit officer for Unit 6 South on February 9, 2016 at midnight.  (T.858, GX208)

The following day, SIS Officer Tomas Rodriguez spoke with Maria on the sixth floor of the MDC's East Building.  (T.198-99, 488)  Officer Rodriguez asked the unit officer in Unit 6 South to send Maria to the counselor or case manager's office, which the unit officer did.  (T.200, 488)  When she first got there, SIS Officer Rodriguez was there with others, but he told them he would speak to Maria on his own since he spoke Spanish.  (T.200)  The others left the office and Officer Rodriguez closed the door, with just him and Maria in the office.  (T.201)  Officer Rodriguez told Maria he had listened to the call, referring to her call with Larihelys Vargas regarding the defendant's Facebook page.  (T.201, 488)  Maria "started to shake."  (T.488)  She got emotional and was crying.  (T.201-02, T.488)  Officer Rodriguez asked Maria if she liked the defendant, and she responded "no." (T.488)  Officer Rodriguez told Maria she could get in trouble for discussing a lieutenant on the phone and that she could be sent to the Special Housing Unit ("SHU").  (T.202, 329-30, 489)  Indeed, Officer Rodriguez told Maria that his supervisor wanted to put her in the SHU. (T.489-90)  Maria looked "really nervous.  She couldn't move.  She could hardly walk." (T.490)   Maria told Officer Rodriguez that she "[didn't] want trouble" and did not want to go to the SHU.  (T.202, 490)  Officer Rodriguez told Maria to "cut the shit" and that "[i]f she continued to act like this, trying to get information, then Mr. Geier would decide to put her in the SHU" and there would be an investigation.  (T.490-91, 502)  Maria recalled that Officer Rodriguez indicated he could prevent that from happening and that the matter would not go any further if Maria promised not to tell anyone; he also instructed Maria not to call Larihelys again.  (T.202-03)  Officer Rodriguez told Maria to go back to her unit.  (T.491) "She could hardly walk.  She was really nervous.  She was [shaking] at the door."  (T.491) Afterwards, Maria told Danilda about her meeting with Officer Rodriguez and the phone call

she made to Larihelys.  (T.571-72)  She appeared "scared and nervous" when doing so.  (T.571)

After meeting with Maria, Officer Rodriguez went to the SIS office and spoke with Mr. Geier.  (T.491)  Officer Rodriguez told Mr. Geier that Maria admitted making the call, that there was nothing between the defendant and Maria, and that Maria "didn't want any problems."  (T.492)  Officer Rodriguez did not tell Mr. Geier that he suspected that there was something inappropriate going on between the defendant and Maria.  (T.501, 516-17)  The call was in Spanish and Mr. Geier did not speak Spanish.  (T.517)  Officer Rodriguez also made no efforts to save the call, even though he knew how to do so.  (T.517)  Mr. Geier told Officer Rodriguez to continue to monitor Maria's calls, which he did.  (T.492)  Thereafter, no other prison officials spoke to Maria about the Facebook call.  (T.203)  The next day, Maria called Larihelys to tell her to "delete" the defendant from Larihelys's Facebook and to let it go because she did not want any problems.  (T.293, 492)  Maria sounded scared and nervous on this call.  (T.492)  After listening to this call, Officer Rodriguez told Mr. Geier about it. (T.493)  No BOP investigation into the matter was opened.  (T.493)

One or two weeks later, Officer Rodriguez spoke with the defendant again about Maria's call to Larihelys regarding the defendant's Facebook page, this time at the MDC.  (T.493)  Officer Rodriguez asked the defendant whether anyone had tried to "friend" him on Facebook.  (T.493)  The defendant said yes, but he did not know who.  (T.493)  Officer Rodriguez responded, "Carlito, report it."  (T.494)  Officer Rodriguez referred to the defendant as "Carlito," which he explained, "as a Latino you use that when it's somebody you esteem.  It's an affectionate term."  (T.494)

On the morning of Saturday, February 27, 2016, Maria and Danilda were asked to clean the fifth floor for Officer Nunez.  (T.205-06, 573, GX7)  The three went to the second floor to obtain cleaning supplies from the Lieutenants' Office area.  (T.205-06, 572-73)  When they arrived, the defendant was inside.  (T.206, 574)  Officer Nunez and Maria went inside the Lieutenants' Office, while Danilda waited outside.  (T.206, 574-75)  Maria went to the cabinet to obtain cleaning supplies.  (T.206)  The defendant asked Maria "why [she] had done that," referring to mentioning the defendant's name on the Facebook call.  (T.206)  Maria was nervous and embarrassed by the way the defendant was speaking to her in front of Officer Nunez.  (T.207)  Officer Nunez then left the office and waited outside with Danilda.  (T.207, 575)  The defendant asked Maria again why she made the Facebook call and Maria responded that she was "tired," referring to being tired "of him doing what he wanted to do with me every time."  (T.207-08)  Maria finished obtaining the cleaning supplies and then left the second floor with Officer Nunez and Danilda.  (T.207, 575-76)  Thereafter, Maria did not see the defendant for several weeks until April 2016, which made her feel "good."  (T.208-09, 572)  From March 9, 2016 to April 14, 2016, the defendant did not work as East Activities Lieutenant.  (T.863, GX242)

(d)     The April 2016 Incident (Counts 17 – 20)

Maria was scheduled to leave the MDC on April 29, 2016.  (T.209)  On April 16, 2016,[14] Maria saw the defendant in Unit 6 South and helped with the count.  (T.209, GX208)  The defendant did not speak with Maria at that time.  (T.209)  Later that day, Maria

---

[14] April 15 and 16, 2016 were the only two days in April 2016 that the defendant and Officer Nunez worked overlapping shifts at the MDC.  (T.863-64, GX242)  MDC records indicate that on April 16, 2016 at 10:25 am, the defendant was in Unit 6 South, consistent with Maria's testimony.  (GX208)

learned that she had been called to clean the second floor.  (T.210)  Maria initially thought

she would be cleaning with Odis, but learned from others that Odis expected to have a visit

that day so would not be cleaning.  (T.210-11)  An officer ultimately escorted Maria alone to

the Lieutenants' Office that day.  (T.211)  The defendant was inside the Lieutenants' Office

when she arrived.  (T.211)  The escort officer then left.  (T.211)  Maria knocked on the door

to the Lieutenants' Office and then entered and went to the cabinet to obtain trash bags.

(T.211-12, GX103B)  Maria then went to the bathrooms to pick up the trash there, and then

changed the trash bags in the containers in the hallway outside the Lieutenants' Office area.

(T.212, GX101D)  While in the hallway, Maria saw Officer Nunez, who asked Maria who

she was on the second floor with.  (T.212-13)  Officer Nunez asked Maria which lieutenant

she was on the second floor with.  (T.213)  Maria responded that she was there with the

defendant.  (T.213)  Officer Nunez shook his head from left to right.  (T.213)  Maria

shrugged and Officer Nunez then went to the Lieutenants' Office as Maria continued to clean

up the trash in the hallway.  (T.213-14)   Maria then cleaned the bathroom's in the

Lieutenants' Office area.  (T.214, GX102(b))  While Maria was cleaning one of the

bathrooms, Officer Nunez exited the Lieutenants' Office, briefly engaged in conversation

with Maria, and then left the Lieutenants' Office area.  (T.214-15)  Thereafter, while Maria

continued cleaning, the defendant called out to her while he was in the Lieutenants' Office.

(T.215)  Maria asked the defendant to wait, but he proceeded to come towards the

Lieutenants' Office and Maria walked over to him.  (T.216)  The defendant grabbed Maria

by the arm and demanded to know why she had spoken to Officer Nunez in a "friendly" way.

(T.216)  Maria responded and then the defendant let go of her arm.  (T.216-17)

Inside the Lieutenants' Office, Maria proceeded to change the trash bag in a small trash can by the Lieutenants' desk.  (T.217-18)  While she was doing so, the defendant came over from the computer and grabbed Maria, started to kiss her, groped her, and tried to pull her pants down.  (T.218)  He then took Maria to a chair by the back wall of the office and put her "on all fours" and grabbed her shoulder, but was unable to do so "as tightly as he usually did" because he had an injury to his hand and had some type of cast on one of his fingers.[15]  (T.218-19)  The defendant then penetrated Maria's vagina with his penis from behind.  (T.219)  While this was happening, Maria felt "bad" but "thought to [her]self, at least this is the last time" because she was leaving the MDC shortly.  (T.220)  When the defendant finished, this time, the defendant ejaculated on Maria's back and then wiped his semen off her back with a paper towel, stating, in substance, "[s]ince you're going to immigration [custody], it could be that they give you a checkup."  (T.219-20)  Thereafter, an officer escorted Maria back to Unit 6 South.  (T.220)  There, Maria saw Odis De La Cruz in the unit and learned that she did not end up having a visit that day.  (T.220-21)

### 4. Maria's Release From the MDC

Upon her release from the MDC on April 29, 2016, Maria was transferred to immigration custody.  (T.223-24)  Danilda Lora Osoria and Melva Vasquez were also in immigration custody and housed in the same facility.  (T.228, 577)  Maria showed them a mark or bruise on her arm that the defendant gave her.  (T.228, 577)  Melva recalled that

---

[15] Notably, the defendant submitted a document to the MDC reporting that he had sustained an injury to his hand outside of the MDC on April 7, 2016 and that he had gone to the hospital to have it treated.  (T.865, 869)

Maria told her that she "had been with [the defendant] again" after Melva left the MDC. (T.454)

        In December 2016, federal agents met with Maria while she was in immigration custody at an Immigration and Customs Enforcement ("ICE") office on Varick Street in Manhattan.  (T.838-39)  Prior to the meeting, Maria did not know that federal agents were going to meet with her or why and she had never reached out to federal agents seeking to speak to them.  (T.229, 839)  She met with the agents without a lawyer present. (T.839)  Maria "looked confused to come out and to see, see all these people there to see her. She looked very nervous and she was scared."  (T.839)  The agents explained to her why they were there and said they were interested in knowing about her time at the MDC, however Maria did not tell the agents about the defendant sexually abusing her at the MDC because she "didn't want problems."  (T.229, 839)  As Maria explained, "You know, when the FBI comes looking for you, I thought they were going to send me back to jail and to be honest, I didn't trust them.  I didn't tell them anything.  I didn't want any trouble."  (T.229-30)  The meeting was short, as Maria was reluctant to speak with the agents.  (T.839-40) Nonetheless, Maria agreed to meet with the agents again with a lawyer present.  (T.230) Maria met with the agents again in January 2017, this time with her immigration lawyer present.  (T.230, 840)  At that second meeting, Maria told federal agents about the defendant sexually abusing her at the MDC.  (T.230)[16]  After this meeting, the government's investigation of the defendant began.  (T.840)

_____

[16] Notably, this was well after Maria's unrelated immigration petitions had been filed by her immigration attorney.  (T.230)

B.    The Jury Charge and Verdict

In its jury charge, the Court instructed the jury on the elements of each type of

crime charged in the Indictment.  With respect to the deprivation of civil rights charges, the

Court instructed the jury that the government had to prove beyond a reasonable doubt:

> First, that on or about the date specified in the count you are
> considering, the defendant acted under color of law.  Second,
> that in so doing the defendant deprived, or caused to be
> deprived, Maria of her right to be free from cruel and unusual
> punishment, which right is secured by the Constitution of the
> United States.  Third, that the defendant acted willfully.  And
> fourth, that the defendant's conduct resulted in aggravated
> sexual abuse of Maria.

(T.1085)  With respect to the aggravated sexual abuse charges, the Court instructed the jury

that the government had to prove the following elements beyond a reasonable doubt:

> [F]irst, that the defendant cause the victim to engage in a sexual
> act, as I will define that term for you.  Second, the defendant
> acted knowingly in causing the victim to engage in that sexual
> act.  Third, the defendant did so by using force against the
> victim.  And fourth, that the offense was committed in a federal
> prison.

(T.1089-90)  With respect to the sexual abuse charges, the Court instructed the jury that the

government had to prove the following elements beyond a reasonable doubt:

> First, that the defendant caused the victim to engage in a sexual
> act, as I will define that term for you.  Second, that the
> defendant acted knowingly by causing the victim to engage in
> that sexual act.  And third, that the defendant did so by
> threatening the victim or placing the victim in fear.  And fourth,
> that the offense was committed in a federal prison.

(T.1092)  Finally, with respect to the sexual abuse of a ward charges, the Court instructed the

jury that the government had to prove the following elements beyond a reasonable doubt:

> First, that the defendant caused the victim to engage in a sexual
> act, as I will define that term for you, even if the victim

30

> consented to the act.  Second, that the defendant acted
> knowingly in causing the victim to engage in that sexual act.
> Third, that at the time alleged in the indictment, the victim was
> in official detention at the Metropolitan Detention Center in
> Brooklyn, New York.  And fourth, that the victim was under the
> custodial, supervisory, or disciplinary authority of the
> defendant.

(T.1095)  In his declaration, defense counsel wrongly asserts that "[f]ifteen of the indictment's twenty counts contained an essential element that required the jury to make a specific finding, beyond a reasonable doubt, that [the defendant] used *physical force* to commit various acts of aggravated sexual abuse."  Defense Decl. at 4 (emphasis in original).  As set forth above, however, only ten of the 20 counts required a finding that the defendant caused Maria to engage in a sexual act using force, namely Counts One, Two, Five, Six, Nine, Ten, Thirteen, Fourteen, Seventeen, and Eighteen.

On January 19, 2018, the jury reached its verdict and found the defendant guilty of all 20 counts in the Indictment.  (T.1163-68)  With respect to the sexual abuse counts, the jury found that the defendant caused Maria to engage in the charged sexual acts by placing her in fear.  (T.1165-66)

III.    The Defense's Post-Trial Request

By letter dated August 22, 2018, defense counsel requested that the government inform the defense whether it disclosed any interviews between the government and an inmate referred to in the defendant's motion for a new trial as "Jane Doe #4"[17]

---

[17] Jane Doe #4 was a victim in a separate trial against defendant Eugenio Perez, who recently convicted of sexual abusing five different women at the MDC, some of them multiple times.  See United States v. Eugenio Perez, 17-CR-280 (S-2) (KAM).  As a testifying victim in the Perez trial, Jane Doe #4's name was not publicly disclosed and she testified under this pseudonym.

"concerning the events of the April 2016 sexual encounter which is alleged in counts 17 through 20 of the indictment and/or the nature of Maria's relationship with Carlos Martinez." The government received this letter by electronic mail while the undersigned Assistant United States Attorney was overseas.  By letter dated September 5, 2018, the government responded to the defense request, stating that in connection with the receipt of the August 22, 2018 letter, "the government believes that it inadvertently did not provide you with the attached Memorandum of Interview of [Jane Doe #4] prior to trial in the above-captioned matter" and provided defense counsel a copy of the report dated April 28, 2017[18] (hereinafter, the "Report").  With respect to the defense request, the Report states:

> [Maria] told [Jane Doe #4] that something was going on between her and Lieutenant Martinez.  A few days before [Maria] left the MDC, she was called to clean the hospital area. Inmate Odis Delacruz asked [Maria] if she wanted her to go with her to clean.  [Maria] said no.  [Jane Doe #4] asked [Maria] if she wanted her to go with her to clean and [Maria] said no and that she will go alone.  [Maria] went to clean and returned approximately two hours later.  A few days after this happened, [Jane Doe #4] asked [Maria] why she did not want Delacruz or her to come along to clean.  [Maria] told her that it was because she was leaving and was having relations with that man.  This was the first time [Maria] told [Jane Doe #4] about this.  [Maria] told [Jane Doe #4] that the Chinese lady (BOP medical staff member) asked [Maria] to have a Pap smear test.  [Maria] did not agree to take the test because she was having relations with Martinez.  [Maria] did not tell [Jane Doe #4] how the relations between her and Martinez started.

---

[18] The date of the Report reflects the date the Report was initially drafted, not the date it was approved by a DOJ-OIG supervisor and ultimately finalized.

<u>ARGUMENT</u>

I.    <u>Legal Standards</u>

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Second Circuit has repeatedly identified the standard of decision for a Rule 33(a) motion as extremely stringent and requires denial of the motion unless it would be a "manifest injustice" to let the verdict stand — that is, that absent a new trial there would be a real concern that an "innocent person" was convicted.  For example, in <u>United States v. Guang</u>, 511 F.3d 110 (2d Cir. 2007), the Second Circuit reiterated this basic rule of decision for Rule 33(a) motions:

> The test is whether "it would be a manifest injustice to let the guilty verdict stand."  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting <u>United States v. Reed</u>, 875 F.2d 107, 114 (7th Cir. 1989)).  For a trial judge to grant a Rule 33 motion, he must harbor "a real concern that an innocent person may have been convicted."  <u>United States v. Parkes</u>, 497 F.3d 220, 232 (2d Cir. 2007) (quoting <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001)).

<u>Guang</u>, 511 F.3d at 119; <u>see also</u> <u>United States v. Canova</u>, 412 F.3d 331, 349 (2d Cir. 2005) ("The 'ultimate test' [for a Rule 33 motion to vacate] is 'whether letting a guilty verdict stand would be a manifest injustice.'" (quoting <u>Ferguson</u>, 246 F.3d at 133)).  In other words, "[t]here must be a real concern that an innocent person may have been convicted."  <u>United States v. Snype</u>, 441 F.3d 119, 140 (2d Cir. 2006) (internal quotation marks omitted).  Indeed, the court "must exercise [its] Rule 33 authority sparingly and in the most extraordinary circumstances."  <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

To establish a Brady/Giglio violation, the defendant must show that (1) the undisclosed evidence was favorable to the defense either because it was exculpatory or impeaching; (2) the prosecution either willfully or inadvertently suppressed the evidence; and (3) as a result, he suffered prejudice. See United States v. Jackson, 345 F.3d 59, 71 (2d Cir. 2003) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Evidence is favorable to the defendant if it either "tends to show that the [defendant] is not guilty or impeaches a government witness." Id. To establish prejudice, the defendant must show the evidence is material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. (citations and internal quotation marks omitted); see also United States v. Agurs, 427 U.S. 97, 112 (1976) (if the omitted evidence creates reasonable doubt that did not otherwise exist, constitutional error has been committed; thus, the omission must be evaluated in the context of the entire record). "This is not a test for sufficiency of the evidence; the defendant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Jackson, 345 F.3d at 73-74 (internal quotation marks omitted). The Supreme Court has ruled that "[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt" and has rejected as "unacceptable" the argument that the standard of materiality "should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." Agurs, 427 U.S. at 112 & n.20.

"[W]here ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998).  See, e.g., Tankleff v. Senkowski, 135 F.3d 235, 250-51 (2d Cir. 1998) (additional impeachment evidence not material where witness's "credibility was already thoroughly undermined on cross-examination"); United States v. Wang, 78 F.3d 73, 80 (2d Cir. 1996) (undisclosed evidence not material where defense already had sufficient evidence of witness's "mendacity, interest and bias"); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (where government witness admitted numerous crimes, including murders, "[t]he addition of a few more allegations would not have materially affected the defense's cross-examination of him."); United States v. Gilbert, 668 F.2d 94, 96 (2d Cir. 1981) (additional impeachment evidence "could hardly have transformed the jury's image of [the witness] from paragon to knave").

A district court's denial of a Rule 33 motion is reviewed for abuse of discretion.  United States v. Stewart, 433 F.3d 273, 295 (2d Cir. 2006).

II.    Analysis

As set forth above, the government inadvertently did not disclose the Report to the defendant prior to trial.[19]  As a result, the second component of the test to determine whether or not a Brady/Giglio violation occurred is not at issue.  The issues that remain are (1) whether the undisclosed information was favorable to the defendant, either because it was

---

[19] To the extent the defendant argues that the government's failure to disclose the Report prior to trial was intentional, rather than inadvertent, he is mistaken.  In any event, the governing law makes clear that the distinction is not relevant to the analysis of whether a Brady/Giglio violation occurred.  See, e.g., United States v. Agurs, 427 U.S. 97, 110 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.").

exculpatory or impeaching; and (2) even if favorable, whether the evidence was material for Brady purposes.

A.       The Report Does Not Provide Material Exculpatory Information

The defendant's assertion that the Report is exculpatory because it provides an account "contrary to [Maria's] testimony that she was forcibly raped" in April 2016 (Defense Decl. at 2) is inaccurate.  As set forth above, the Report is consistent with Maria's testimony that (1) the defendant sought Maria specifically to clean on the date of the April 2016 incident; (2) no other inmate went to the second floor with Maria that day, (3) the defendant's April 2016 interaction with Maria was sexual in nature; and (4) the defendant had previously engaged in sexual intercourse with Maria.  The Report is silent regarding whether force or fear were used in the April 2016 sexual encounter or any previous such encounter.   Indeed, the Report indicates that Jane Doe #4 was not present in the Lieutenants' Office when the April 2016 incident took place.  Nor was she present for any of the previous incidents and the Report discloses that she had no information about "how the relations between [Maria] and [the defendant] started."  As a result, contrary to the defendant's claims, the Report does not provide information that exculpates the defendant; it inculpates him.

Jane Doe #4's account in the Report that Maria indicated days after the April 2016 incident, in response to questioning from Jane Doe #4, that she wanted to go to the second floor alone "because she was leaving and was having relations with" the defendant does not alter this conclusion.  The defendant's assertion that the Report shows Maria went to the second floor that day "for the purpose of a wanted sexual encounter," Defense Decl. at 13, overstates and mischaracterizes the information in the Report.  First, the Report – consistent with the trial record – does not indicate that Maria had an independent desire to go

to the second floor that day.  The Report states that Maria "was called to clean the hospital

area."  As confirmed by multiple witnesses who testified at trial, as an inmate assigned to

cleaning duties, Maria was required to report for work on the second floor when a Lieutenant

called for her.  It was not a choice or a desire on her part; it was a requirement.  A decision

by Maria to go to the second floor alone, knowing she had been called by the defendant and

was required to go, "because she was leaving and having relations with" him is not the same

as, and does not establish or suggest that, Maria "purposefully orchestrated [the encounter]

for the purpose of a wanted sexual encounter,[20] and not for the purpose of forcible rape."[21]

Defense Decl. at 13.  As the Court's jury charge made clear, to prove aggravated sexual

abuse, the government "[was not] required to show that [Maria] resisted" to establish that the

defendant caused the sexual acts by using force against her.  (T.963)

Even assuming, arguendo, that the Report did tend to exculpate the defendant

(which it does not), it is not material for Brady purposes when  assessed in the context of the

entire trial record, as the Supreme Court requires.  See United States v. Agurs, 427 U.S. 97,

112 (1976) (holding that the omitted evidence . . . must be evaluated in the context of the

---

[20] As reflected in the Court's jury charge set forth above, while it may be relevant to
the extent it negates the required causation for certain of the charged crimes, lack of consent
is not an element of any of the crimes charged in the Indictment.

[21] Moreover, even if one assumes for argument's sake that the defense is correct in
this regard, the material would only be exculpatory as to the April 2016 incident, not any of
the prior incidents, and only with respect to the civil rights, aggravated sexual abuse, and
sexual abuse charges related to that incident (Counts 17, 18 and 19).  Although in parts of his
declaration and memorandum the defendant appears to claim otherwise, it is clear that this
argument would have no bearing on the defendant's sexual abuse of a ward conviction
related to the April 2016 incident (or otherwise), as that crime does not have the use of force
or fear as an element, and simply requires that the defendant engaged in a sexual act with
Maria while she was in his custodial, supervisory, or disciplinary authority.

entire record"). Maria provided credible, compelling testimony about how the defendant's conduct escalated from being friendly, to unwanted sexual comments, to using force and fear to cause her to engage in oral and then vaginal sex with him on December 13, 2015 and at least nine times thereafter. Her testimony was extensively corroborated by other witnesses and documentary evidence. While no one else was in the Lieutenants' Office when the defendant sexually abused Maria, her testimony was not the only evidence linking him to the charged crimes. For example, the circumstances of the first incident were corroborated by other evidence, including the inmates who saw the state Maria was in afterwards, the fact that she was bleeding, and the records and testimony showing that the defendant purchased the Plan B pill and delivered it to her after midnight.

As the trial evidence showed, her reaction to the first rape was the most outwardly severe and noticeable, which is unsurprising, given the continuous and inevitable nature of the sexual abuse that ensued. Maria testified that the defendant raped her at least ten times while she was an inmate at the MDC, including on occasions when she was accompanied by Odis De La Cruz to the second floor to clean.  (See, e.g., T.166)  Having another inmate accompany Maria to the second floor did not in any way dissuade, impede, or prevent the defendant's sexual abuse of Maria, given, among other things, (1) his facile ability to get Maria inside the Lieutenants' Office alone, while the other inmate was cleaning another area on the second floor (in Odis's case, the area on the other end of the hallway by the Legal Department), and (2) his effective use of the computer's camera system to monitor the area while abusing Maria.  Even Officer Smith's presence in the Lieutenants' Office was no impediment, as the defendant simply sent him on an errand to the West Building to ensure he was not present during the ensuing 20 minutes, which the defendant used to sexually

abuse Maria on one occasion.  In this way, the evidence presented at trial did not show (and the government never argued) that the April 2016 incident resulted "from happenstance or bad luck," Defense Decl. at 13, it was instead the result of the knowing and intentional actions of the defendant.

Moreover, in assessing the Report in the context of the entire trial record, it is important to remember that the April 2016 incident took place months after the defendant had learned of the February 2016 Facebook call, had it played for him by Officer Rodriguez, and consulted with Officer Rodriguez about it at least twice (facts about which Maria testified, which were again extensively corroborated by other witnesses, Facebook records, telephone records, and MDC records).  At this point, the defendant knew that no further investigation related to the Facebook call had occurred and that Maria's transfer from the MDC to immigration custody was imminent.  Similarly, when summoned to clean by the defendant in April 2016, Maria knew that this was likely to be the last time she was raped by the defendant, given her imminent departure from the MDC.  By this point, Maria knew from experience that if the defendant called her to the second floor, he was going to rape her and that the presence of another inmate on the floor would not prevent or dissuade the defendant in any way.  Based on what the defendant had told her, Maria also believed that she could end up in the SHU and get more prison time if the sexual abuse became known, a belief that was confirmed by Maria's meeting with SIS Officer Rodriguez.  Viewed in the proper context of the entire record, there would be nothing "astonishing," Defense Decl. at 13, about Maria not wanting another inmate to come down to the second floor with her – an inevitably futile step that would not have prevented the sexual abuse, but would have increased the risk of shame and embarrassment if someone saw her in that position, or worse, jeopardized her

imminent release date.  As Maria repeatedly testified, she was "tired" and just wanted "to get

out of that hell hole." (T.161, 176, 178, 195, 207).[22]  The most important thing to her was

"[t]o get out of there."  (T.58)  Indeed, the Report corroborates this sentiment, rather than

undermines it.  According to the Report, Maria told Jane Doe #4 that she went alone to clean

"<u>because she was leaving</u> and was having relations with that man." (emphasis added).

   As a result, when viewed in the full context of the trial record, the Report

cannot "reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).

  B. <u>The Report Does Not Provide Material Impeachment Information</u>

   While the Report discloses information that is inconsistent with Maria's

testimony, which thus constitutes impeachment information, it is limited and discrete in

nature.  As set forth above, Jane Doe #4's account in the Report is inconsistent with Maria's

testimony regarding why she went to the second floor alone in April 2016.  In context, this

inconsistency does not constitute material impeachment information.

   Defense counsel engaged in an extensive and vigorous cross-examination of

Maria that lasting several hours over two days.  That cross-examination covered a wide

variety of subjects, including (1) the details underlying Maria's federal conviction for drug

conspiracy; (2) her post-arrest statements to law enforcement agents following her federal

arrest, which included statements that were false; (3) her statements during a safety-valve

---

[22] Indeed, her resignation to the defendant's inevitable actions is evident from Maria's
own description of her interaction with Officer Nunez on the second floor the day of the
April 2016 incident, shortly before the defendant raped her.  Maria testified that when she
told Officer Nunez, in response to his question, that she was on the second floor with the
defendant, Officer Nunez shook his head from left to right (T.213).  Maria testified that she
shrugged and continued cleaning.  (T.213-14)

proffer with a federal agent and prosecutor in her criminal case, which included statements that were false; (4) her guilty plea in her criminal case; (5) her interview with probation; (6) statements made by her lawyer at her sentencing proceeding, which she did not correct; (6) the state of her relationship with her husband; (7) how she paid for her criminal lawyer; (8) her Facebook call with Larihelys Vargas and her motivations for having Larihelys look the defendant up on Facebook; (9) her awareness of how to make a complaint at a federal prison and her failure to report the sexual abuse to prison officials; (10) prior statements she made to federal agents investigating the instant case; (11) statements made in her immigration petitions; and (12) her attorney's filing of a Notice of Claim form to preserve Maria's right to sue the federal Bureau of Prisons and the $20 million amount set forth on the Claim.  (T.243-46, 250-76, 314-33; 365-77, 386-405, 429-34).  During his cross-examination, defense counsel further suggested that the only reason Maria asked Larihelys Vargas to look the defendant up on Facebook was because of "jealousy," characterized the morning-after pill that the defendant gave to Maria as "a gift," and suggested that she kissed Noel Lopez to make the defendant jealous.  (T.376, 390-91, 394)

In his summation, defense counsel argued that Maria was "an inherently unreliable opportunist who manipulates her friends. . . . She manipulates BOP people, staff, prosecutors, a federal judge, and even her own lawyer to do what she wants to do to get what she wants."  (T.1013)  He argued that the jury could not rely on any of Maria's testimony, which consisted of "manipulation, guile, and lies".  (T.1014-15)  He also argued that the testimony of Kiara, Melva, and Danilda could not be relied upon because they had been convicted of drug offenses.  (T.1019-20)  He argued that Maria pursued the defendant (T.1028) and asked Noel Lopez to kiss her to make the defendant "jealous."  (T.1031)

41

Indeed, defense counsel's summation makes clear that it is simply preposterous to suggest that Maria's testimony regarding the April 2016 incident went "unchallenged" at trial or that the undisclosed Report prevented the defendant from "argu[ing] that these sexual encounters engaged in by 'Maria' were not the result of physical force."  Defense Memo at 12, 13.  The entire tenor of defense counsel's cross-examination and impeachment of Maria, his cross-examination of other witnesses, and his summation, was a forceful argument that Maria could not be believed in any respect and that the entirety of her testimony regarding the defendant, including her testimony regarding the use of force and fear, from the first incident to the last – and everything in between – was false. Notwithstanding this direct, forceful, and sustained challenge to Maria's credibility, the jury found her testimony credible in light of the entire trial record.

Given the breadth and quality of the impeachment information defense counsel had available for use in his extensive and rigorous cross-examination of Maria, the undisclosed information in the Report is not sufficient "to undermine confidence in the outcome" of the trial.  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005); see also United States v. Agurs, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.") (emphasis added); Giglio v. United States, 405 U.S. 150, 154 (1972) (undisclosed impeachment evidence is not material in the Brady sense when, although "possibly useful to the defense," it is "not likely to have changed the verdict") (internal quotation marks omitted).  The impeachment value of the information in the Report is minimal and cumulative of equally impeaching evidence

introduced at trial.[23]  As set forth above, defense counsel impeached Maria with inconsistent

statements she purportedly made to other witnesses relevant to the charged crimes and,

further, extensively cross-examined Maria on false statements she admitted making in the

past in connection with her criminal case.  In these circumstances, information from the

Report would not have materially increased the jury's likelihood of discrediting Maria.[24]

---

[23] The defendant's citation to United States v. O'Conner, 64 F.3d 355, 359 (8th Cir. 1995), Defense Memo at 11, does not alter this conclusion.  There, the government failed to disclose that one of its cooperating witnesses had reported that (1) two other cooperating witnesses were attempting to influence his trial testimony during the trial; and (2) these same two cooperating witnesses had threatened the witness prior to their cooperation with the government.  The court noted that this was particularly strong impeachment evidence because if the cooperating witnesses in question "were telling the truth at trial, there would be little reason for them to try to influence [the other cooperating witness's] testimony."  Id. at 358 n.4.  While other impeachment material was available to the defense, namely that they were seeking 5K motions from the government and had not yet been sentenced and that there were inconsistencies in their stories, this evidence did not render the undisclosed evidence immaterial, given the particular strength and character of the undisclosed material.  Id at 359.  Here, the impeachment material in the undisclosed Report is significantly less compelling than the other impeachment evidence available at trial, not more.

[24] The Defendant's suggestion that the government's Rule 412 motion was somehow improper is without merit.  See Defense Decl. at 9-10, n.2.  Jane Doe #4 did not witness the incident disclosed in the Rule 412 motion.  ECF No. 30, at 30, n.11  As the disclosure made clear, the April 2016 incident where Lieutenant Eugenio Perez made inappropriate comments to Maria, exposed his penis to her, grabbed her hand in an attempt to make her touch his penis and asked him to give her oral sex, which she did not do, occurred while Maria was alone in the Lieutenants' Office and Jane Doe #4 was outside.  Id.  The Report does not suggest otherwise and indeed discloses that Jane Doe #4 was not inside the Lieutenants' Office with Maria and Lieutenant Perez in the period of time before Lieutenant Perez thereafter chose to sexually abuse Jane Doe #4, as witnessed by Maria – conduct which constituted serious crimes for which he was convicted in United States v. Eugenio Perez, 17 CR 280 (S-2) (KAM).  Indeed, for this conduct, Lieutenant Perez was convicted of sexual abuse by threatening and placing Jane Doe #4 in fear, in violation of 18 U.S.C. § 2242(1), sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b), and deprivation of civil rights, in violation of 18 U.S.C. § 242.  Notably, both Maria and Jane Doe #4 testified at the Perez trial and their accounts of what transpired were generally consistent and corroborative of one another, as evidenced by the jury's verdict.  In the event the Court would like to see the relevant transcripts from the Perez trial, the government can provide them upon request.  The government was under no obligation to disclose to the defendant information regarding the

Her credibility was thoroughly tested on cross-examination and during defense counsel's questioning of other witnesses. The defendant has not shown a reasonable probability that disclosure of the Report would have changed the outcome of the trial.

CONCLUSION

For the foregoing reasons, the defendant's motion for a new trial pursuant to Rule 33 should be denied.

Dated:     Brooklyn, New York
           January 19, 2019

                              Respectfully submitted,

                              RICHARD P. DONOGHUE
                              United States Attorney
                              Eastern District of New York
                              Attorney for Plaintiff
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                    By:     /s/ Nadia I. Shihata
                            Nadia I. Shihata
                            Assistant United States Attorney
                            (718) 254-6295

---

sexual abuse of Jane Doe #4, which Maria witnessed, or any inconsistencies of their accounts of what transpired in connection with a crime committed by a person other than the defendant.  Notably, however, the government did produce further information about that incident in Maria's 3500 material in advance of trial, which disclosed the existence of Jane Doe #4, the fact that she was housed with Maria in Unit 6 South in April 2016, and that she had cleaned the second floor with Maria in April 2016.  See, e.g., 3500-M-4, 3500-M-7(b).  Finally, the defendant's claim that the report discloses a sexual episode with Officer Adwapa is false.  The Report's only mention of Adwapa is a conversation when Jane Doe #4 went over to Nani's bed and talked with Nani and Maria "about if they liked Adwapa."  The defendant's imputing a sexual connotation to the word "like" in reference to Adwapa is unfounded and, even such an unwarranted connotation does not disclose "another [sexual] episode" implicating Rule 412.