UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA        *      Docket No.
                                *      17-CR-281 (ERK)
                                *
            v.                  *      U.S. Courthouse
                                *      Brooklyn, NY
                                *
CARLOS RICHARD MARTINEZ,        *
                                *      February 10, 2020
            Defendant.          *      3:44 PM
 * * * * * * * * * * * * * * * *

              TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
                BEFORE THE HONORABLE EDWARD R. KORMAN
                    UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:             RICHARD P. DONOGHUE, ESQ.
                               UNITED STATES ATTORNEY

                         BY:   ELIZABETH A. GEDDES, ESQ.
                               NADIA I. SHIHATA, Esq.
                               Asst. United States Attorney
                               United States Attorney's Office
                               271 Cadman Plaza East
                               Brooklyn, NY  11201

For the Defendant:             ANTHONY L. RICCO, ESQ.
                               20 Vesey Street, Suite 400
                               New York, NY 10007

                               CARLOS M. SANTIAGO, ESQ.
                               The Law Office of
                               Carlos M. Santiago
                               11 Broadway, Suite 615
                               New York, NY 10004

Transcription Services:        Transcriptions Plus II, Inc.
                               61 Beatrice Avenue
                               West Islip, NY 11795
                               laferrara44@gmail.com




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

Proceedings                                         2

1              THE CLERK:  United States v. Carlos Martinez.

2              Your appearances, counsel.

3              MS. GEDDES:  Elizabeth Geddes and Nadia Shihata for

4    the government.  Also seated at counsel table is Special Agent

5    Elliot McGinnis, and Teri Carby, a paralegal in our office.

6              Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              MR. RICCO:  Good afternoon, Judge Korman, Anthony

9    Ricco for Carlos Martinez.

10             And Your Honor, I'm joined by Carlos Santiago,

11   counsel, and Your Honor may recall he is a participant in the

12   Mentoring Program.

13             THE COURT:  Right.

14             MR. RICCO:  And also I'm joined by paralegal Minit

15   Rallah (ph.) and, of course, Carlos Martinez.

16             THE COURT:  Okay.

17             MR. SANTIAGO:  Afternoon.

18             MR. MARTINEZ:  Good afternoon.

19             THE COURT:  Do I need to deal with the so-called in

20   limine motions before, before we start?  Before opening, even

21   before opening statements?  I don't think so.

22             MS. GEDDES:  I don't believe so.

23             MR. RICCO:  No, Judge.

24             THE COURT:  Good.  We'll deal with them later then.

25   I don't like to keep the jury waiting.

1          All right, bring in the jury.

2     (Pause)

3          THE CLERK:  All rise.

4     (Jury In)

5          THE CLERK:  Please be seated.

6          THE COURT:  Is there any reason why the jury should

7     not be sworn?

8          MS. GEDDES:  No, Judge.

9          MR. RICCO:  No, Your Honor.

10         THE COURT:  All right.  Swear the jury.

11    (Jury sworn)

12         THE CLERK:  Please be seated.

13         THE COURT:  All right.  Ladies and gentlemen of the

14    jury we're about to begin this trial about which you have heard

15    something during the process of jury selection.  Before the

16    trial begins, however, there are certain things I wish to tell

17    you which will help you understand what will be presented

18    before you, and how you should conduct yourselves during the

19    trial.

20         To begin with you are here to administer justice in

21    this case according to the law and the evidence with complete

22    fairness and impartiality and without bias, prejudice or

23    sympathy for or against the government or the defendant.

24         This is important to the defendant who is charged

25    with a crime and has the constitutional right to receive a fair

Proceedings                                                          4

1   trial.  The case is also important to the government since the

2   enforcement of the criminal laws is important.

3          The case is based on an indictment which has been

4   read to you, quite recently, by the Magistrate Judge and to

5   which the parties will refer in their opening statements, and

6   which I will read to you again when I give you my instructions

7   on the law.  The indictment is simply the document by which a

8   criminal action is commenced, it is merely an accusation of a

9   charge.  It is not evidence of the defendant's guilt.

10          Since the defendant has pleaded not guilty, the

11   government has the burden of proving each of the essential

12   elements of the crime charged in the indictment beyond a

13   reasonable doubt.  The purpose of the trial is to determine

14   whether the government meets this burden.

15          The defendant does not have to prove his innocense.

16   On the contrary, the defendant is presumed to be innocent of

17   the accusations contained in the indictment.

18          The trial will proceed in the following order:

19   First. the parties have the opportunity to make opening

20   statements.  The government will make such a statement, then

21   the defendant, although he is not obliged to do so, may through

22   his attorney make an opening statement or defer until the end

23   of the government's case.  What is said in these statements is

24   not evidence, it is simply an introduction to the evidence

25   which the parties intend to produce.

Proceedings                                              5

1          Second, the government will introduce evidence in

2     support of the charges.  Then the defendant may present

3     evidence, but is not required to do so.  The burden is always

4     on the government to prove every element of the offense charged

5     beyond a reasonable doubt.  The law never imposes on a

6     defendant in a criminal case the burden of calling any

7     witnesses or introducing any evidence.

8          Fourth, after all the evidence has been presented

9     each party has the opportunity to present argument in support

10    of his case.  What is said in these arguments is not evidence,

11    they simply present to you the contentions of the parties as to

12    what the evidence has shown, and what inferences may be drawn

13    from the evidence.  The government will have the right to open

14    and close the argument which we refer to as summations.

15         After the summations, I will instruct you on the

16    applicable law and then you will retire to consider your

17    verdict.  Your verdict must be unanimous as to every party and

18    on every count.  You have a tremendously important task as

19    jurors, it is to determine the facts.  Our constitution gives

20    the defendant the right to have you, who are members of the

21    community, find those facts.  You, and not I, are the sole

22    judge of the facts.

23         I shall try to preside impartially and not to express

24    any opinion concerning the facts; however, if at any time I

25    should make any comment with respect to the facts, you should

1  disregard it.

2           It is your judgment as to the facts, not mine, which

3  controls.  As the sole judge of the facts you must determine

4  which of the witnesses you believe and what portion of their

5  testimony you accept and what weight you attach to it.

6           When an objection to a question is sustained, you

7  should disregard the question and draw no inferences from its

8  wording about the answer that might have been given.  Where an

9  objection is overruled, evidence then received has no special

10 weight just because it was unsuccessfully objected to.

11          You must not consider anything you may have read or

12 heard about the case outside the courtroom whether before or

13 during trial.

14          Now I know that many of you use cell phones and

15 Blackberries, the internet, and other tools of technology.  You

16 must not talk to anyone at any time about this case or use

17 those tools to communicate electronically with anyone about

18 this case.  This includes your family and friends.  You may not

19 communicate with anyone about this case on your cell phone,

20 through e-mail, Blackberry, iPhone, text messaging or on

21 Twitter.  Through any website, blog, including Facebook,

22 Google, MySpace, LinkedIn or YouTube.  You may not use any

23 similar technology of social media, even if I have not

24 specifically mentioned it.  I expect you to inform me as soon

25 as you become aware of another juror's violation of these

1    instructions.

2         And I would add to that you should not use any of

3    these to do research about the case or research about any

4    issue.  Your verdict in this case is going to ultimately have

5    to be based on what you hear in this courtroom.

6         Now no statement, remark or comment which I may make

7    during the course of the trial is intended to indicate any

8    opinion as to how you should decide the case or influence you

9    in any way in your determination of the facts.  At times I may

10   ask questions of witnesses, if so it's for the purpose of

11   bringing out matters which I feel should be brought out and not

12   in any way indicating an opinion about the facts or to indicate

13   the weight that you should give to the testimony of the

14   witness.

15        Now there are several rules which should govern your

16   conduct during any recesses.  You will not be required to

17   remain together while the Court is in recess, but you are

18   required to follow these instructions about recesses.

19        First, do not discuss the case among yourselves or

20   with anyone else.  You should keep an open mind reaching your

21   conclusion only during your final deliberations, after all the

22   evidence is in, you've heard the attorneys' summations, and my

23   instructions on the law, and then, only and after exchange of

24   views with other members of the jury.

25        Now the instruction I've just given you is

1   counterintuitive.  Serving on a jury is an interesting and

2   unique experience for many of you, not all, and it is something

3   that you would naturally want to discuss with family or friends

4   when you see them when you get at home.  And we ask you not to

5   do that because we want you to decide the case on what you hear

6   here in Court, and when you start conversing with someone about

7   the case, before you know it they're giving you their opinion

8   when they haven't heard any of what went on in this courtroom.

9   So in order to guard against that we ask  you not to discuss

10  the case with anyone else.

11          And the instruction that you not discuss the case

12  among yourselves is also counterintuitive because at the moment

13  the case is all you have in common and it's quite natural that

14  you would want to talk about it, and we ask you not to do it

15  because when you start talking about the case prematurely

16  before you've heard all the evidence and the attorneys'

17  arguments and my instructions on the law, you might jump to

18  conclusions which may not be warranted or be premature.  So

19  that's why we ask you not to discuss the case among yourselves,

20  and by that I mean as a commonsense rule don't discuss whether

21  you believe or disbelieve a particular witness or you believe

22  or don't believe that the defendant is guilty or not guilty

23  until you've heard all the evidence, the attorneys' arguments

24  and my instructions on the law.

25          You should also not permit any other person to

1    discuss the case in your presence and if anyone does so that

2    you tell them not to, report that fact to me.  You should not,

3    however, discuss with your fellow jurors either that fact or

4    any fact that you feel necessary to bring to my attention.

5          Finally, though it is a normal human reaction to talk

6    with people with whom one is thrown into contact.  Please do

7    not do so whether in the courtroom, in the hallways, in the

8    elevator outside or anywhere else with any of the parties or

9    their attorneys, or any witnesses.  By this I mean, not only do

10   not talk about the case, but do not talk at all even to pass

11   the time of day.

12         Now those of you who have been selected as alternate

13   jurors should listen just as carefully and as conscientiously

14   as the other jurors.  You may very well be called upon prior to

15   the conclusion of the case to take the place of one of the

16   jurors and then you will have to render a verdict so please pay

17   strict attention at all times.

18         All right.  Who is going to give the opening

19   statement?

20         MS. SHIHATA:  I will.

21   GOVERNMENT'S OPENING STATEMENT:

22         MS. SHIHATA:  This case is about power and abuse.

23   That man, the defendant, Carlos Martinez abused his position

24   and power as a law enforcement officer, a lieutenant, with the

25   Federal Bureau of Prisons, by repeatedly raping a female inmate

1   entrusted in his care and custody.

2          Good afternoon, ladies and gentlemen, my name is

3   Nadia Shihata and I'm an Assistant United States Attorney.

4   Here with me this afternoon is Assistant United States Attorney

5   Elizabeth Geddes, along with Elliot McGinnis, Special Agent

6   with the Federal Bureau of Investigation, and Teri Carby, a

7   paralegal in our office.  Together we represent the United

8   States, and we will present the evidence against the defendant.

9          On a Sunday in December of 2015, a woman, an inmate,

10  got summoned by the defendant to clean the lieutenants' office

11  on the second floor of the Metropolitan Detention Center here

12  in Brooklyn, known as the "MDC."

13          During this trial you'll learn her real name, but

14  we'll refer to her by a pseudonym "Maria" to protect her

15  privacy.  Maria was in her late 20s, didn't speak much English,

16  and her family was far away in the Dominican Republic.  She

17  hadn't had a single visitor at the MDC.  She was isolated.

18  Vulnerable.  Facing immigration custody and possible

19  deportation after serving her sentence.

20          By December 2015 Maria had worked as a cleaner at the

21  MDC for over six months.  But had more recently started

22  cleaning for the defendant.  At first the defendant was nice to

23  her.  He would ask Maria how her week went as she went about

24  her cleaning.  He began calling her by her first name and

25  sharing personal information about himself.

1           And then the defendant, a boss at the prison, took

2   things a step further making inappropriate sexual comments to

3   Maria, asking her if she masturbated.  Suggesting that she

4   should finger him and touch herself.  But even with the

5   defendant's comments in the back of her mind Maria never

6   expected what happened next.

7           On that Sunday in December her life changed forever.

8   An officer took Maria from her unit, the second floor, to

9   clean, leaving her alone with the defendant in the lieutenants'

10  office.  Once there Maria prepared to clean like always.  While

11  the defendant sat at his desk in the office she crouched down

12  to gather and prepare some cleaning liquids that were stored in

13  an area behind that same desk.  Maria had her back towards the

14  defendant.

15          The defendant then turned his chair towards her, when

16  Maria looked his way she saw the defendant's erect penis

17  exposed through the zipper of his pants.  The defendant then

18  grabbed Maria's head and forced his penis into her mouth.  She

19  struggled to push herself away but wasn't able to.  She felt

20  like she was being choked.  The defendant then lifted Maria up

21  and pushed her face forward onto the desk.  He pulled her pants

22  and underwear down then penetrated Maria's vagina with his

23  penis from behind.

24          Maria was crying.  He kept going.  When he finally

25  finished, the defendant cleaned himself off and told Maria she

1    was bleeding.  The defendant ejaculated inside of Maria that

2    day.  So on top of everything else she had just been through,

3    she was terrified she'd get pregnant.  She begged the defendant

4    to get her the morning after pill, an emergency contraceptive

5    that prevents women from getting pregnant when taken shortly

6    after unprotected sex.  But the defendant told her to calm

7    down, not to worry, she wouldn't get pregnant because he had an

8    operation, a vasectomy which meant he couldn't impregnate her.

9    Maria wasn't convinced and she was desperate for that pill,

10   pleading with the defendant to bring it to her even after he

11   told her she didn't need it.

12            Eventually to calm Maria down, the defendant relented

13   and told her he would try to bring the pill to her later that

14   night when he was back on shift around midnight.  The officer

15   took Maria back to her unit, but before she left the defendant

16   made sure to let Maria know there would be consequences if she

17   told anyone what happened.  She would end up with more jail

18   time if anyone found out and she would be sent to the SHU,

19   special housing, solitary confinement.  In the place where

20   inmates were routinely disciplined on the word of an officer.

21            That's what the defendant, the lieutenant with the

22   power and authority to discipline inmates like Maria, that's

23   what he told her.  And not just that Sunday.  See the defendant

24   didn't just rape and sexually abuse Maria that one time, in the

25   weeks that followed he did it again, and again, and again.

1   Over and over and over.  In the same location, under the same

2   guise of calling Maria down to clean.

3             During this trial, you'll learn that at the times the

4   defendant chose to rape Maria the lieutenants' office and

5   surrounding areas were basically empty.  And you'll also learn

6   that there were no cameras inside the lieutenants' office.

7   Something the defendant, the supervisor in the prison, knew.

8   But there were cameras in other parts of the prison.  And

9   you'll learn that the defendant had access to those cameras

10  from the computer on the desk in the lieutenants' office so he

11  could see and know if anyone was coming while he sexually

12  assaulted Maria.  It was his foolproof system.  A system that

13  also let Maria know that the defendant could watch her even

14  when she wasn't with him.

15            For his conduct the defendant is charged in a 15-

16  count indictment with crimes related to certain specific

17  incidences of his sexual abuse of Maria.  Those crimes fall

18  into three categories.  First, depriving Maria of her civil

19  rights, specifically her right as a prisoner to be free from

20  cruel and unusual punishment in the form of the defendant's

21  aggravated sexual abuse.  Second, the crime of aggravated

22  sexual abuse for using force to cause Maria to engage in

23  various sexual acts with him.  And third, the crime of sexual

24  abuse using threats and fear to cause Maria to engage in those

25  acts.

1          So how will we prove that the defendant committed

2     those crimes?  First, we'll hear from Maria, the survivor,

3     herself.  She'll take that witness stand and tell you what the

4     defendant did to her.  She'll come into this courtroom and

5     relive the worst period of her life there.  Telling you in

6     explicit detail how the defendant used force, threats, fear and

7     his position of power as a lieutenant to sexually abuse her

8     repeatedly.

9          She'll tell you about the humiliation and shame she

10    felt afterwards.  The fear she endured and the steps she took

11    to try to make it stop.  Including the call she made asking a

12    friend to look the defendant up on Facebook.  Hoping the

13    defendant would monitor the call, get worried his name was

14    mentioned and finally stop the abuse.

15         And the defendant did find out about that call and

16    did stop raping Maria for a period of time.  But then he raped

17    her again, one last time on April 2016, before she was

18    transferred into Immigration custody.

19         You'll also hear from other women who were housed at

20    MDC.  Women who saw Maria after she returned to her unit that

21    Sunday in December, after the first time the defendant raped

22    her.  They'll describe how she looked and acted for hours

23    afterwards and how she confided to them some of what happened

24    at that time.  How she was bleeding, crying, scared, and not

25    her normal self the rest of that day and the days following.

1          You'll see medical records showing the defendant had
2   a vasectomy, just like he told Maria.  And you'll hear from a
3   doctor, an expert, who will explain to you what that means.
4   You'll hear from MDC officers and other witnesses who will
5   corroborate, will back up, aspects of Maria's testimony.  And
6   you will see prison records, phone records and Facebook records
7   that do the same.
8          And finally, ladies and gentlemen, you'll see and
9   hear testimony about bank records and records from Rite-Aid
10  Pharmacy proving that on that Sunday, December of 2015, after
11  the first rape when Maria begged him for that morning after
12  pill, just a few hours later the defendant used a debit card to
13  buy that pill.  At a Rite-Aid not far from his house.  He even
14  used his Rite-Aid rewards card to get a $5 discount on it.
15         That's just a brief summary of some of the evidence
16  you'll see and hear during this trial.  At the end of this
17  case, after you've seen and heard all the evidence, we'll have
18  a chance to speak with you again and at that time we'll ask you
19  to find the defendant guilty on all counts.
20         Thank you.
21         THE COURT:  Mr. Ricco.
22         MR. RICCO:  Thank you, Judge.
23  DEFENSE'S OPENING STATEMENT:
24         MR. RICCO:  What are my concerns?  My concerns is
25  after hearing such a detailed, gripping, emotionally moving

1   story, how do you look people in the face and ask them to

2   believe you?  How do you ask people to believe in the

3   presumption of innocence?  How do you ask people to give, you

4   heard Lieutenant Martinez a trial?

5           There are some charges that just from the nature of

6   the charges themselves make your job excruciatingly difficult.

7   I'm concerned about that.  It's important to me that throughout

8   these proceedings that as the lawyer, myself and Carlos

9   Santiago, who is sitting over my shoulder, that we are able to

10  maintain your respect, and your honor, and commitment to the

11  principles that we've talked about in jury selection.

12          We live in very difficult times where we hear these

13  type of allegations, and we hear $2 dollar lawyers making

14  statements about it, and sometimes people are infuriated by

15  them.  So what I'm saying to you all is I hope and pray that we

16  haven't lost you on the opening statements because Judge Korman

17  told you that opening statements are not evidence, just a

18  theory of the case and if we lost you on the theory, and as the

19  witnesses take the stand, you're listening for the theory as

20  opposed to the defense.

21          Now I can tell how some of you are looking, and it

22  doesn't feel good.  We have a system that is very difficult for

23  us, for all us to participate in because oftentimes the charges

24  themselves set off in us an emotional reaction that makes it

25  difficult for us to listen.  The most important thing is not to

1   get before you and tell you an equally compelling story to sort

2   of capture your heart about what you're going to hear.

3              I could do that.  It could be done.  This is not

4   about storytelling.  This is about proving the case.  And so

5   you have to reserve your judgment about it, as hard as it is.

6   The failure to do so means that our system doesn't work.  And

7   the responsibility for this is with you.  So, I'm not going to

8   preview the facts to you.  I could.

9              I could tell you all those details you heard is all

10  about a $20 million lawsuit.  I could tell you other facts, but

11  then that would be unfair because the person who is the accuser

12  should get their day in court.  I'll promise you this, I

13  promise you that the questions I will ask, will be the kinds of

14  questions that you would want to ask in the search for the

15  truth about what happened.

16             You're going to hear from many witnesses.  You're

17  going to hear from witnesses who do not "corroborate" what Ms.

18  Shihata just said.  You're going to hear from staff people who

19  do not corroborate what Ms. Shihata just said.  Your read of

20  those Facebook posts and those Facebook texts may not

21  corroborate what Ms. Shihata said.  And the purchase of the

22  pill may not corroborate the story of that the purchase of the

23  pill is connected to.

24             And so what I'm going to ask you do is to think, it's

25  a hard thing to do, because we live in a society where people

1  look at people and we look over there and they look at his face

2  and they -- if they can.  Some people can't look at him.  And

3  they look over there and say he looks guilty to me, and then

4  everything that we hear is based upon our perception that he

5  looks guilty.  So I'm going to ask you not to do that, if you

6  can.  And that you withhold your judgment way down the line

7  until Judge Korman instructs you on the law, until you go into

8  the jury room, and you start deliberating about the testimony

9  that you've heard.  And then to piece it together, step-by-

10 step, piece-by-piece.

11        And that's really all I have to say at this point.

12 No long drawn out circumstance, just a request that each of you

13 live up to the duty that you swore that you would live up to.

14 And some, you know, we talked to some of the jurors on the side

15 and if you can't, then tell the judge and let the alternates

16 come in.  Don't stay here if your mind is already made up

17 because you would be engaged in something worse than the story

18 you just heard.

19        So as we sit here right now, the person that is hard

20 for us to look at, hey, listen under the law he's presumed to

21 be innocent.  And he's entitled to that presumption just as

22 much as either one of us would be, or any of our loved ones

23 would be.  And he carries that every day.  And I'm going to ask

24 that when you come in here every day on your way to the

25 courthouse that you recommit yourself to the presumption of

1    innocence and that you try hard to do it, pray on it, get it

2    done.  If you can come in here everyday carrying that

3    responsibility, at the end of the day you're verdict will be

4    not only justified but honored by everybody.

5             So that's all I have to say at this point.  I'm going

6    to be asking questions and I'm going to ask you to please try

7    to listen to the questions and answers and follow us through

8    this trial.  Okay?  All right?  All right.

9             Judge Korman, thank you.

10            THE COURT:  Thank you.

11            All right.  Call your first witness.

12            MS. SHIHATA:  The government calls Maria.

13   (INTERPRETERS SWORN)

14            THE CLERK:  Please state your name for the record.

15            THE INTERPRETER:  Elizabeth Caruso.

16            THE INTERPRETER:  Vivian Goa.

17            THE COURT:  Would you raise your right hand?

18   "M A R I A",

19       having been first duly sworn, was examined and testified

20       as follows:

21            THE COURT:  Please be seated.

22            MS. SHIHATA:  May I inquire, your Honor?

23            THE COURT:  Yes.

24   DIRECT EXAMINATION

25   BY MS. SHIHATA:

1      Q     Good afternoon.

2             MS. SHIHATA:  I'm showing the witness only what's

3    been marked for identification as Government Exhibit 2.

4             THE CLERK:  ELMO or laptop?

5             MS. SHIHATA:  ELMO, please.

6             THE COURT:  Ladies and gentlemen, I just want to say

7    that in Mr. Ricco's opening he referred to texts and Facebook.

8    What he's referring to is evidence that's going to be admitted

9    here.  You should not go looking, again, for anything on the

10   internet.

11            MS. SHIHATA:  I'm showing the witness only what's

12   been marked for identification as Government Exhibit 2.

13   Q     Do you recognize this photograph?

14   A     Yes.

15   Q     Who is this a photograph of?

16   A     Me.

17            MS. SHIHATA:  I move to admit Government Exhibit 2.

18            MR. RICCO:  Without objection, your Honor.

19            THE COURT:  It's admitted.

20   (Government's Exhibit 2 received into evidence.)

21            MS. SHIHATA:  May I publish it to the jury, please?

22            THE COURT:  Yes.

23            MS. SHIHATA:  May I approach, your Honor?

24            THE COURT:  Yes.  You don't ever have to ask me.  You

25   can always do it.

1           THE CLERK:  But you do need to remember to speak only

2    in front of the microphones.

3    Q    I'm showing you what's been marked for identification as

4    Government Exhibit 2-A.  Is this the same photograph I just

5    showed you in Government Exhibit 2 with your true name written

6    underneath?

7    A    Yes.

8           MS. SHIHATA:  I move to admit Government Exhibit 2-A.

9           MR. RICCO:  Without objection, your Honor.

10          THE COURT:  It's admitted.

11   (Government's Exhibit 2-A received into evidence.)

12          MS. SHIHATA:  And I would ask to publish it to the

13   jury.

14          THE COURT:  Doesn't it go up on the screen?  I don't

15   like --

16          MS. SHIHATA:  It has her true name, your Honor.

17   Q    Now, for the purposes of your testimony here today, we are

18   going to refer to you as "Maria."  Okay?

19   A    Okay.

20   Q    How old are you?

21   A    Thirty-three.

22   Q    Where were you born?

23   A    In the Dominican Republic.

24   Q    How far did you go in school?

25   A    Two years of college.

"Maria" - Direct - Shihata                                    22

1    Q      In what country?

2    A      In the Dominican Republic.

3    Q      At some point in your life, did you spend time in a

4    federal prison?

5    A      Yes.

6    Q      What prison or prisons?

7    A      At the MCC Manhattan and MDC Brooklyn.

8    Q      And does "MCC" stand for Metropolitan Correctional Center?

9    A      Yes.

10   Q      And you testified that's in Manhattan?

11   A      Yes.

12   Q      And you mentioned "MDC."  Does that stand for Metropolitan

13   Detention Center?

14   A      Yes.

15   Q      And where is that located?

16   A      In Brooklyn.

17   Q      Did something happen to you while you were housed at the

18   MDC?

19   A      Yes.

20   Q      What happened?

21   A      I was raped.

22   Q      By who?

23   A      Martinez.

24          MS. SHIHATA:  I'm showing the witness only what's

25   been marked for identification as Government Exhibit 1.

1    Q    Do you recognize this -- the person in this photo?

2    A    Yes.

3    Q    Who is this a photo of?

4    A    Martinez.  Lieutenant Martinez.

5    Q    Is that the Martinez you just referred to?

6    A    Yes.

7             MS. SHIHATA:  I move to admit Government Exhibit 1.

8             MR. RICCO:  It's without objection.

9             THE COURT:  It's admitted.

10   (Government's Exhibit 1 received into evidence.)

11            MS. SHIHATA:  If we could publish it, please, on the

12   screens.

13   Q    Now you said -- you testified you went to college in the

14   Dominican Republic, correct?

15   A    Yes.

16   Q    What did you study there?

17   A    Civil engineering.

18   Q    And when did you move to the United States?

19   A    In 2008, April of 2008.

20   Q    And how old -- around how old were you at that time?

21   A    Twenty-one, twenty-two.

22   Q    What area did you move to?

23   A    Queens.

24   Q    Why did you come to the United States?

25   A    My boyfriend.

1   Q     Did you come to the United States legally?

2   A     Yes.

3   Q     And after you got to the U.S., did you marry your

4   boyfriend?

5   A     Yes.

6   Q     Did you become a legal, permanent resident of the United

7   States?

8   A     Yes.

9   Q     After coming to the United States, did you work?

10  A     Yes.

11  Q     What types of jobs?

12  A     Housekeeping at the Sheraton, Hilton, Western Union, a

13  supermarket.

14  Q     And before going to prison, did you also continue your

15  education in the United States?

16  A     Yes.

17  Q     What did you study?

18  A     I was studying English to then go on to nursing.

19  Q     And did you actually go on to the nursing part?

20  A     No.

21  Q     Do you have any children?

22  A     No.

23  Q     Sometime after you moved to New York, were you contacted

24  by a man you knew from the Dominican Republic?

25  A     Yes.

1   Q    What if anything did he ask you to do?

2   A    To go pick up drugs.

3   Q    From where?

4   A    Manhattan.  Vermilyea.

5   Q    Did you ultimately end up picking up drugs for this man at

6   some point?

7   A    Yes.

8   Q    Approximately how many times?

9   A    Five.  Three.  I don't remember.  I don't remember exactly

10  how many.

11  Q    Fair to say multiple times?

12  A    Yes.

13  Q    Why did you do that?

14  A    Because he told me I had to pay some money.

15  Q    How much --

16  A    And -- and I didn't have any money to pay him with.

17  Q    How much money did he say you had to pay him?

18  A    A little over 300.

19  Q    Three hundred what?

20  A    Thousand dollars.

21  Q    Why did he say you owed him $300,000?

22  A    Because the first time he asked me to go and pick up

23  drugs, I didn't go, and the drugs got lost.

24  Q    And what did you understand that to mean?

25  A    I don't know who picked up those drugs, but he said he

1   wasn't going to be the only one paying for the drugs.  I had to

2   pay him for them.

3   Q    Were you scared of this man?

4   A    Yes.

5   Q    Are you still scared of him today?

6   A    Yes.

7   Q    What job did you have at the time when you were told you

8   owed $300,000?

9   A    Housekeeping.

10  Q    Could you afford to pay $300,000?

11  A    No.

12  Q    What if anything did the man say about how you could pay

13  this debt?

14  A    So you go and pick up drugs, just do that continuously.

15  And every time I did that, he would take $2,000 off.

16  Q    $2,000 off the debt?

17  A    Yes.

18  Q    I want to direct your attention to September 18th, 2013.

19  Were you arrested that day?

20  A    Yes.

21  Q    On what type of charge?

22  A    Conspiracy and possession of drugs.

23  Q    And were you planning to pick up drugs that day?

24  A    Yes.  I was -- I went out to pick it up.

25  Q    And what if any arrangement had you made with respect to

1   payment for picking up drugs that day?

2   A    That he give the money to my brother, not to give me the

3   money, because -- not to take it off, because my dad was sick

4   and I wanted to put Dad in a clinic.

5   Q    Okay.  So in this -- on this occasion, did you ask to

6   actually be paid $2,000 rather than having it taken off the

7   debt?

8   A    Yes.

9   Q    Had you ever been arrested before that day?

10  A    No.

11  Q    Were you questioned by the agents who arrested you the

12  same day you were arrested?

13  A    Yes.

14  Q    Were you truthful with those agents?

15  A    No.

16  Q    Following your arrest, were you incarcerated?

17  A    Yes.

18  Q    Where?

19  A    At the MCC Manhattan.

20  Q    Are you familiar with the term "safety valve proffer"?

21  A    Yes.

22  Q    What is your understanding of what a safety valve proffer

23  is?

24  A    It's a meeting.  Your lawyer's there, the agents who

25  arrested you are there, and you have to tell the whole truth

1   about what you did.

2   Q    And do prosecutors also attend that meeting?

3   A    Yes.

4   Q    Is there any condition -- I'm sorry.  You indicated you

5   have to tell the truth about what you did, at the safety valve

6   proffer.  Is that correct?

7   A    Yes.

8   Q    And for what purpose do you have to tell the truth at that

9   proffer?

10  A    So they can -- well, so they can take off two points for

11  time, from your sentence.

12  Q    And is there any condition to getting -- what is your

13  understanding of what the condition to getting less time for

14  participating in a safety valve proffer is?

15  A    Tell the truth.

16  Q    In connection with your arrest, did you plead guilty?

17  A    Yes.

18  Q    What did you plead guilty to?

19  A    Possession and a drug conspiracy.

20  Q    Before your guilty plea, did you participate in a safety

21  valve proffer?

22  A    Yes.

23  Q    Were you completely truthful in your safety valve proffer?

24  A    No.

25  Q    What if anything did you leave out?

1   A    Who the drugs belonged to, how many times I had gone out

2   to pick up drugs.  I don't remember, but --

3   Q    Why did you leave out who the drugs belonged to?

4   A    Because I was in jail at that point.  I couldn't say who

5   the drugs belonged to.  In other words, I wasn't going to put

6   my family at risk.

7   Q    Had anything happened to your family prior to that?

8   A    Yes.

9   Q    What had happened?

10  A    The house caught fire.

11  Q    Whose house?

12  A    My parents' -- my house.

13  Q    The house in the Dominican Republic?

14  A    Yes.

15  Q    And what if anything happened to your brother -- or one of

16  your brothers in that fire?

17  A    He died.

18  Q    What if anything did you learn about that fire after

19  speaking with the man who asked you to pick up drugs?

20  A    That he had been -- he had been the one who had sent it to

21  be done.

22  Q    Now, were you sentenced on January 29, 2015?

23  A    Yes.

24  Q    What sentence did you receive?

25  A    Three years in prison and two years of probation.

1   Q     What if any benefit did you receive from your safety valve

2   proffer?

3   A     They reduced time.

4   Q     Were you facing a mandatory minimum sentence for the crime

5   you had pled guilty to?

6   A     Yes.

7   Q     What mandatory minimum sentence were you facing?

8   A     Ten years.

9   Q     Was that based on the amount of drugs you were going to

10  pick up?

11  A     Yes.

12  Q     And were you sentenced below that, due to your safety

13  valve proffer?

14  A     Yes.

15  Q     When you were sentenced, what prison were you housed in,

16  at the time of your sentencing?

17  A     MDC Brooklyn.

18  Q     I'm sorry.  Were you -- at the time you were sentenced,

19  were you housed in Manhattan or Brooklyn?

20  A     In Manhattan.

21  Q     And were you transferred to another prison at some point

22  after that?

23  A     Yes.

24  Q     Which prison?

25  A     MDC Brooklyn.

"Maria" - Direct - Shihata                                31

1    Q    Around when did you first arrive at the MDC?

2    A    Around March or April.

3    Q    Of what year?

4    A    2015.

5    Q    And when were you released from the MDC?

6    A    29th of April, 2016.

7    Q    And had you been in prison the entire time since your

8    arrest?

9    A    Yes.

10   Q    When you were in prison, what was the most important thing

11   to you?

12   A    My time.

13   Q    What do you mean by that?

14   A    My time to get out, like my good time.

15   Q    What is "good time"?

16   A    It's the time they reduce from your sentence because if

17   you don't get tickets and you behave properly.

18   Q    What is a "ticket"?

19   A    It's -- ticket is like when you do something bad, the

20   officer gives you a ticket.

21   Q    And does that result in some form of discipline?

22   A    Yes.

23   Q    When you were at the MDC, how many units were there for

24   female inmates?

25   A    Two.

1   Q     What if anything were those units called?

2   A     "South" and "North."

3   Q     What floor were they on?

4   A     Sixth.

5   Q     And generally speaking, what type of inmates were housed

6   in Unit 6 North?

7   A     The inmates who were awaiting to be sentenced.

8   Q     And what type of inmates were housed in Unit 6 South?

9   A     Those of us who were sentenced.

10  Q     What type of inmate were you when you were housed at the

11  MDC?

12  A     Sentenced.

13  Q     And for most of your time at the MCC, what type of inmate

14  were you?  In the MCC.  I'm sorry.

15  A     Awaiting my sentence.

16  Q     And while you were awaiting your sentence when you were

17  housed at the MCC, was your court case still going on for most

18  of the time you were there?

19  A     Yes.

20  Q     How often would you see your lawyer when you were at the

21  MCC?

22  A     Frequently.  When there was anything, he would just come

23  and visit.

24  Q     Would you also see him when you appeared in court?

25  A     Yes.

1  Q    How if at all did that change after you were sentenced?

2  A    After I was sentenced, the lawyer didn't come back.

3  Q    Was your court case over at that point?

4  A    Yes.

5  Q    Now, you testified you were -- or I'm sorry.  Which unit

6  were you housed in at the MDC?

7  A    South.

8  Q    On the sixth floor?

9  A    Yes.

10  Q    And can you describe for the jury what the general layout

11  of Unit 6 South was?

12  A    The door.  When you entered, the kitchen was on the left.

13  The officers' office, and the counselor's office.  Then the

14  bathrooms and a little room.  And on the right side were the

15  phones, computer, and the beds.  And in the middle were the

16  chairs and the tables where we ate.  And the TV.

17  Q    I'm going to show you a series of photographs marked for

18  identification as Government Exhibits 104-A through 104-E.  Can

19  you take a moment to review these photographs and tell me if

20  you recognize them.

21  A    Yes.

22  Q    And what area of the MDC are these photographs of?  What

23  area of the MDC are these photographs of?

24  A    The officers' and the counselor's office, the bathroom,

25  the table where you eat, the phones and the computer, the beds

1    -- and the beds.

2    Q    And are these all photographs of portions of Unit 6 South?

3    A    Yes.

4         MS. SHIHATA:  I move to admit Government Exhibits

5    104-A through 104-E.

6         MR. RICCO:  Without objection, your Honor.

7         THE COURT:  They're admitted.

8    (Government's Exhibits 104-A through 104-E received into

9    evidence.)

10   Q    Starting with Government Exhibit 104 --

11        THE COURT:  Could you close the light?

12   Q    -- C, what area is this?

13   A    The tables where we ate, the phones and the computer, the

14   officers' office and the counselor's office, and the kitchen.

15   Q    Okay.  And can you point out in this photograph where the

16   entrance -- where if anywhere the entrance to the unit is?

17   A    Here.

18   Q    And can you actually -- you can actually make a mark on

19   your screen.

20        THE INTERPRETER:  Nothing's happening.

21        MS. SHIHATA:  Okay.  I don't think it's working.

22   Q    I'm pointing to a door in the middle of the photograph

23   with what looks like an "exit" sign on top. Is that the

24   entrance to the unit?

25   A    Yes.

1    Q     Okay.  And this office next to this -- what appears to be

2    an ice machine, what is that?

3    A     The officers' office.

4    Q     Now, you testified when you were at the MDC there were TVs

5    in your unit.  Is that right?

6    A     Yes.

7    Q     Where were those?

8    A     In those -- on those columns there in the middle.

9    Q     Okay.  So affixed somewhere on these -- the top of these

10   columns?

11           THE INTERPRETER:  I'm sorry.  Can you repeat the

12   question?

13   Q     Affixed somewhere on the top of these columns?

14   A     Yes.

15   Q     Showing you Government Exhibit 104-E.  Is this a close-up

16   of the entrance to the officers' office in the unit?

17   A     Yes.

18   Q     And I'm showing you Government Exhibits 104-B and 104-A.

19   What are these photos of?

20   A     The beds.

21   Q     And when you were there, did the beds have mattresses on

22   them?

23   A     Yes.

24   Q     I'm showing you Government Exhibit -- what's in evidence

25   as Government Exhibit 104-D.  What is this a photo of?

1   A    The bathrooms.  The sinks.  And a little room in the rear.

2   Q    And this little room in the rear, what's in there?

3   A    It's like a slop sink where you can wash by hand, or wash

4   dishes.

5   Q    And across from the sinks, what is across from the sinks?

6   A    The bathrooms.

7   Q    And where if anywhere are the showers?

8   A    The first ones are the showers.  The second ones are the

9   bathrooms.

10  Q    And so where I'm pointing here, what are those?

11  A    The bathrooms.

12  Q    And behind them?

13  A    The toilets.

14  Q    Okay.  Which of those two is the showers?  This one or

15  this one?

16  A    The first one.

17  Q    Okay.

18  A    That one.

19  Q    Now, as an inmate at the MDC, was Unit 6 South where you

20  spent most of your time?

21  A    Yes.

22  Q    What if any privacy did you have there?

23  A    None at all.

24  Q    Who were the people that were in charge of you at the MDC?

25  A    The lieutenants, the officers, and the counselor.

1  Q     And were there rules that you had to follow as an inmate

2  at the MDC?

3  A     Yes.

4  Q     What kind of rules?

5  A     Keep your uniform on until 4:00 in the afternoon.  Work.

6  Be in your bed after the 10 o'clock count.  What else?

7  Q     Okay.  Were those some of the rules?

8  A     Yes.

9  Q     And if an inmate didn't follow the rules at the MDC, what

10 was your understanding of what would happen?

11 A     The officer would give you a ticket.

12 Q     And what if anything would that lead to?

13 A     Go to the SHU or some of your privileges could be taken

14 away from you, phone, computer, visits.

15 Q     Now, you mentioned phone privileges.  What type of phone

16 privileges did you have as an inmate at the MDC?

17 A     You got 300 minutes a month and you could use them during

18 the day until 10 o'clock, 9 o'clock.  I don't know.  I don't

19 remember what time.

20 Q     And those 300 minutes, were they free?

21 A     No.

22 Q     Did you have to pay for them?

23 A     You had to pay when you called, yes.

24 Q     And how did you work when you wanted to make a phone call?

25 A     You'd pick up the phone, dial the number, and then you had

1    to punch in your ID number, put money in if you didn't have

2    any, and that was it.  You'd make your call.  After the --

3    after the machine would stop talking and saying your

4    information.

5    Q    Now, you mentioned the term "SHU."  What is the "SHU"?

6    A    It's like a small punishment room where you get locked in,

7    and supposedly they take you out -- I never went there -- two

8    times a week to take a shower, and they take away all of your

9    privileges.

10   Q    Now, are you familiar -- sorry.  Going back to the

11   telephone calls, you mentioned something about a machine.  When

12   you made a call at the MDC, what if anything were you informed

13   of at the beginning of each call?

14   A    Put in your name -- say your name.  That the call was

15   being recorded from a prison.  I don't remember any more.

16   Q    Are you familiar with the terms "recall" and "count"?

17   A    Yes.

18   Q    What is "recall" at the MDC?

19   A    When -- well, there was a blue line.  And you had to put

20   yourself before the line when they said "recall," and that was

21   for the count.

22   Q    I'm showing you what's in evidence as Government Exhibit

23   104-A.  Is the line you're referring to in this exhibit?

24   A    Yes.

25   Q    Which one is it?

1    A    The first one.

2    Q    That I'm pointing to here?

3    A    Yes.

4    Q    What is the "count"?

5    A    It's when the officers come and count you to see if all

6    the inmates are there.

7    Q    And when you were at the MDC, how many times would the

8    "count" happen?

9    A    At 4:00 and at 10:00.

10   Q    Okay.  And was there any difference in the number of times

11   the count occurred on Monday through Friday versus the

12   weekends?

13   A    Yes.

14   Q    What difference?

15   A    Saturdays and Sundays -- well, on the weekend -- the count

16   would happen three times, 10:00, 4:00, and again at 10:00 at

17   night.

18   Q    And how about on Monday through Friday?

19   A    Twice.

20   Q    What were you permitted to wear as an inmate at the MDC?

21   A    Your uniform, gray pants with a shirt.  And weekends,

22   sweatpants.

23   Q    Okay.  So the pants and shirt you described was your

24   uniform?

25   A    Yes.

1    Q    And you testified you could wear sweats on weekends?

2    A    Yes.

3    Q    Were there times you could also wear sweats Monday through

4    Friday?

5    A    After 4:00.  After the count.

6    Q    Where did inmates change their clothes in Unit 6 South?

7    A    Right in front of your bed, right in front of the

8    bathrooms, some people inside the bathroom.

9    Q    Where did you change your clothes?

10   A    Inside the bathroom.

11   Q    Why?

12   A    Because I didn't want them to see my body.  Some women let

13   anybody see their body.

14   Q    As a sentenced prisoner at the MDC, were you required to

15   work?

16   A    Yes.

17   Q    What job or jobs did you first have when you got there?

18   A    In the unit kitchen; and in the laundry, but only a few

19   days, until they gave me my steady job which was cleaning --

20   cleaning.

21   Q    And the laundry you mentioned for a few days, was that in

22   your unit?

23   A    Yes.

24   Q    And once you got your cleaning job, what if any areas were

25   you required to clean as part of your job?

1  A    The second floor.

2  Q    And to the best of your memory, around when did you start

3  cleaning the second floor area?

4  A    Practically from when I got there.  Maybe a month later.

5  Q    Okay.  And at some point did you start cleaning the second

6  floor regularly?

7  A    Yes.

8  Q    And about how often would you clean the second floor?

9  A    Anytime they would call for me to go clean.  The doctors,

10  the legal people, or the lieutenants.

11  Q    And what specific types of cleaning did you do?

12  A    The garbage, mopping, dusting, cleaning.

13  Q    And when you first started to clean the second floor on a

14  regular basis, who if anyone did you clean with?

15  A    With Carmen Lopez and Odie de la Cruz.

16  Q    Now, did Carmen Lopez leave the MDC at some point while

17  you were there?

18  A    Yes.  She left.

19  Q    Around when did Carmen Lopez leave the MDC?

20  A    November 1st, 2015.

21         MS. SHIHATA:  Showing the witness only what's been

22  marked for identification as Government Exhibit 8.

23  Q    Do you recognize the person in this photo?

24  A    Yes.

25  Q    Who is that?

1   A    Odie de la Cruz.

2   Q    And is that the Odie de la Cruz that you just mentioned

3   you sometimes cleaned with?

4   A    Yes.

5            MS. SHIHATA:  I'd move to Government Exhibit 8.

6            MR. RICCO:  Without objection, your Honor.

7            THE COURT:  It's admitted.

8   (Government's Exhibit 8 received into evidence.)

9            MS. SHIHATA:  If we could publish it on the screens.

10  Q    Now, when you got to the MDC, was Odis de la Cruz there

11  when you got there?

12  A    Yes.

13  Q    And when you left the MDC, was she still there?

14  A    Yes.

15  Q    And just to be clear, was she another inmate at the MDC?

16  A    Yes.

17  Q    After Carmen Lopez left the MDC, were there times when you

18  were called to clean the second floor alone?

19  A    Yes.

20  Q    As a general matter, how did you learn when you were

21  needed to clear -- to clean the second floor on a particular

22  day?

23  A    The officer would call you over the loudspeaker or some

24  would come over to you and they'd say get ready, you have to go

25  clean.

1  Q    And what if anything did you have to do to get ready to go

2  clean?

3  A    Put your uniform on, if you weren't already wearing it.

4  Get the mops, the paper towels, and the pail that you put water

5  in.

6  Q    And how -- how did you get to the second floor?

7  A    The officer had to take me down there.

8  Q    Was that by elevator?

9  A    Yes.

10 Q    I'm showing you what's been marked for identification as

11 Government Exhibits 101-A through 101-E.  Can you take a moment

12 to look at these photographs and tell me if you recognize them.

13 A    Yes.

14 Q    And are these all photographs from the second floor of the

15 MDC?

16 A    Yes.

17        MS. SHIHATA:  I move to admit Government Exhibits

18 101-A through 101-E.

19        MR. RICCO:  Without objection, your Honor.

20        MS. SHIHATA:  They're admitted.

21 (Government's Exhibits 101-A through 101-E received into

22 evidence.)

23 Q    I'm showing you what's in evidence was Government Exhibit

24 101-A.  What does this photo show?

25 A    The two elevators and the door where the officer who took

1    you had to say your name.  And the control would open.

2              THE INTERPRETER:  Correction.  The officer would have

3    to say his name.

4    Q    And is this the hallway you had to go to, to get to a

5    particular area?

6    A    Yes.

7    Q    And what area was beyond the door that controlled?

8    A    The same hallway.  On the left side are the lieutenants'

9    office and the chaplain.  On the right-hand side is the

10   dentist, another office that belongs to a lady.

11   Q    Okay.  And I'm showing you Government Exhibit 101-B.  What

12   is this a photo of?

13   A    The same door.

14   Q    And what is the black square next to the door?

15   A    It's where the officer had to say his name.

16   Q    In order for what to happen?

17   A    So that the door would be opened.

18   Q    Showing you what's in evidence as 101-C.  Is that the same

19   door -- photograph of the same door open?

20   A    Yes.

21   Q    Showing you what's in evidence as Government Exhibit

22   101-D.  What does this photo show?

23   A    On the left side are the doors for the lieutenants.  The

24   second door is where you went to get water.  The third door is

25   where you waited for the doctors.  On the right side is the

1   dentist's door.

2   Q    Okay.  And so the first door on the left side that I'm

3   pointing at, what is that the entrance to?

4   A    The lieutenants, the chaplain, the captain.

5   Q    Showing you what's in evidence as Government Exhibit

6   101-E.  Is this photo a close-up of the door to that same area

7   that you just described?

8   A    Yes.

9   Q    I'm showing you what's been marked for identification as

10  Government Exhibits 102-A through 102-G.  Can you look through

11  these photographs and tell me if you recognize them.

12  A    Yes.

13  Q    And are these photographs 102-A through 102-G, are they

14  all photographs of the lieutenants' office area on the second

15  floor of the MDC and the surrounding areas?

16  A    Yes.

17            MS. SHIHATA:  I move to admit Government Exhibits

18  102-A through 102-G.

19            MR. RICCO:  And that's without objection, your Honor.

20            THE COURT:  They're admitted.

21  (Government's Exhibits 102-A through 102-G received into

22  evidence.)

23  Q    Showing you what's in evidence as Government Exhibit

24  102-A.  What is this area?

25  A    The first door -- well, this area is the hall.  The first

1    door belongs to the chaplain.  The second one belongs to the

2    lieutenants.  The third one in the rear is the captain, and

3    the door that is open is the bathroom.

4    Q    Okay.  When you say the first door, are you referring to

5    this one that I'm pointing at?

6    A    Yes.

7    Q    That's the chaplain area?

8    A    Yes.

9    Q    And the door with the little trash can in front of it,

10   which office is that?

11   A    The lieutenants.

12   Q    And the door next to that?

13   A    The captain.

14   Q    And you testified this open door belongs to a bathroom.

15   Is that correct?

16   A    Yes.

17   Q    Showing you what's in evidence as Government Exhibit

18   102-B.  What are the two doors that are on either side of the

19   couch in this photograph?

20   A    The two bathrooms.

21   Q    And this door that has an "exit" sign on top of it, is

22   that the entrance to this area?

23   A    Yes.

24   Q    And showing you what's in evidence as Government Exhibit

25   102-D.  What is this door on the right side of the photograph?

1   A     The lieutenants' door.

2   Q     And on the other side of the photograph, what is this door

3   and window to?

4   A     The chaplain.

5   Q     Showing you what's in evidence as Government Exhibit

6   102-E.  What does this photo show?

7   A     That's the hallway.  At the end, there's a little room in

8   the rear where they put you if you're nervous -- if the person

9   is nervous or is sort of crazy.

10  Q     Is that the suicide watch area?

11  A     Yes.

12  Q     Showing you what's in evidence as Government Exhibit

13  102-G.  What is this?

14  A     It's the hallway, but going back to the exit.  At the very

15  end is the lieutenants' door.

16  Q     And is this -- in the front part of the photograph, is

17  this a closer-up view of that suicide watch area?

18  A     Yes.  In those little rooms, they put them there.

19  Q     And showing you what's in evidence as Government Exhibit

20  102-F, is this part of that same hallway as what was in the

21  last exhibit?

22  A     Yes.

23  Q     And this door with the "exit" sign on top, what is that?

24  A     The lieutenants'.

25  Q     The lieutenants' office?

1    A    Yes.

2    Q    And I'm pointing to a little circular object close to the

3    ceiling.  Do you see that?

4    A    Yes.

5    Q    Do you know what that is?

6    A    The camera.

7    Q    Now, you testified earlier that an officer would escort

8    you to the second floor to clean.  Is that right?

9    A    Yes.

10   Q    As a general matter, when an officer escorted you to clean

11   the second floor, would he stay with you on the second floor or

12   leave?

13   A    He would leave.

14   Q    Was there a particular officer who generally stayed while

15   you cleaned?

16   A    Yes.

17   Q    And who was that?

18   A    Smith.  Officer Smith.

19        MS. SHIHATA:  I'm showing the witness -- I'm showing

20   the witness only what's been marked for identification as

21   Government Exhibit 3.

22   Q    Do you recognize the person in this photo?

23   A    Yes.

24   Q    Who is it?

25   A    Smith.

"Maria" - Direct - Shihata                                    49

1   Q      Is that the Officer Smith you just referred to?

2   A      Yes.

3              MS. SHIHATA:  I move to admit Government Exhibit 3.

4              MR. RICCO:  Without objection, your Honor.

5              THE COURT:  It's admitted.

6   (Government's Exhibit 3 received into evidence.)

7              MS. SHIHATA:  If we could publish it on the screen.

8   Q      Now, who were some of the lieutenants that you cleaned for

9   while you were at the MDC?

10  A      Almos (ph.), Rodriguez, Maldonado, Martinez, and an

11  African -- Afro-American lady.  I don't know her name.

12             MS. SHIHATA:  Showing the witness only what's been

13  marked for identification as Government Exhibit 9.

14  Q      Do you recognize the person in this photo?

15  A      Yes.

16  Q      Who is it?

17  A      Lieutenant Rodriguez.

18  Q      And was he a lieutenant you cleaned for at some point

19  while you were at the MDC?

20  A      Yes.

21             MS. SHIHATA:  Move to admit Government Exhibit 9.

22             MR. RICCO:  Without objection, your Honor.

23             THE COURT:  It's admitted.

24  (Government's Exhibit 9 received into evidence.)

25             MS. SHIHATA:  And may we publish it?  Thank you.

1   Q     Now, are you familiar with the term "SIS" at the MDC?

2   A     Yes.

3   Q     What is your understanding of what "SIS" is?

4   A     It's the investigators at the prison.

5   Q     And at some point after you got -- after the point in time

6   when you cleaned for Lieutenant Rodriguez, did you understand

7   that he had become an SIS officer?

8   A     Yes.

9   Q     Now, you testified you also cleaned the second floor for

10  Lieutenant Martinez.  Is that correct?

11  A     Yes.

12  Q     Do you know his first name?

13  A     Yes.

14  Q     What is it?

15  A     Carlos.

16  Q     Do you see Carlos Martinez in the courtroom here today?

17  A     Yes.

18  Q     Can you point him out by an item of clothing he's wearing

19  and/or where he's sitting?

20  A     He's wearing a black jacket and white shirt.

21  Q     And is he wearing -- well, where is he seated?

22  A     To my right.

23  Q     And is he -- there are a number of people seated to your

24  right.  Where at the table is he seated?

25  A     In the middle of two people.

1      MS. SHIHATA:  Indicating the defendant, your Honor?

2      THE COURT:  Yes.

3  Q    How did you first meet the defendant?

4  A    I was cleaning the lieutenants' office for Almos, I think.

5  Q    And was Almos a lieutenant?

6  A    Yes.

7  Q    And who if anyone was in the lieutenants' office while you

8  were cleaning?

9  A    Almos and Martinez.

10 Q    And what if anything did you hear the defendant say to

11 Lieutenant Almos?

12 A    If he could go and get me so that I could clean for him.

13 Q    Sometime after that, did you start cleaning the second

14 floor for the defendant?

15 A    Yes.

16 Q    Do you recall approximately when you first started

17 cleaning for the defendant?

18 A    In August or September.

19 Q    Of what year?

20 A    2015.

21 Q    And when you first started cleaning for the defendant,

22 what areas of the second floor did you generally clean for him?

23 A    Bathrooms, the lieutenants' office, the hall, and that's

24 it.

25 Q    And as a general matter, what days of the week did the

1   defendant generally send for you to come clean on the second

2   floor?

3   A    Friday, Saturday, and Sunday.

4   Q    Around what time would he generally call for you to clean

5   on Fridays?

6   A    After the count, around 5:30 or 5:00, something like that.

7   Q    That's in the afternoon?

8   A    Yes.

9   Q    And how about on Saturdays and Sundays?

10  A    After 10:30 in the morning.

11  Q    Can you describe for the jury what the second floor was

12  like on Fridays after around 5:00 p.m.

13  A    No staff.

14  Q    What do you mean by that?

15  A    Well, that is there were no people around.  Sometimes the

16  chaplain was there.  But there wasn't anybody else there, just

17  the lieutenant and me.

18  Q    And what was the second floor like on Saturdays and

19  Sundays after around 10:30 in the morning?

20  A    Same way.  Empty.

21  Q    When you first started to clean for the defendant, where

22  would the officer who escorted you generally take you on the

23  second floor?

24  A    To the lieutenants' office.

25  Q    I'm showing you what's been marked for identification as

1    Government Exhibits 103-A through 103-E.  Can you take a moment

2    to look through these photographs and tell me if you recognize

3    them.

4    (Pause)

5    Q    Do you recognize them?

6    A    Yes.

7    Q    Are Government Exhibits 103-A through 103-E all

8    photographs of portions of the lieutenants' office on the

9    second floor?

10   A    Yes.

11           MS. SHIHATA:  I move to admit Government Exhibits

12   103-A through 103-E.

13           MR. RICCO:  That's without objection, your Honor.

14           THE COURT:  Admitted.

15   (Government's Exhibits 103-A through 103-E received into

16   evidence.)

17   Q    Showing you what's in evidence as Government Exhibit

18   103-A.  What is this a photo of?

19   A    Inside the lieutenants' office.

20   Q    And is this from the entrance, this view?

21   A    Yes.

22   Q    Showing you 103-B.  Is this another photo from the

23   opposite view?

24   A    Yes.

25   Q    Showing you what's in evidence as Government Exhibit

1   103-C.  What is this a photo of?

2   A     The lieutenants' desk.

3   Q     I'm showing you what's in evidence as Government Exhibit

4   103-D.  What is this a photo of?

5   A     The lieutenants' chair.

6   Q     Now, is there any particular area in the lieutenants'

7   office where cleaning supplies were kept?

8   A     Yes.

9   Q     What area?

10  A     There was a closet on the left.

11  Q     Showing you what's in evidence as Government Exhibit

12  103-E.  What's this a photo of?

13  A     The closet where the liquids you used for cleaning were

14  kept.  The other big one, that's where they put things that

15  they took away from inmates.

16  Q     The one to the left?

17  A     Yes.  And I don't remember what's in the last one.

18  Q     At some point did you learn that cleaning supplies were

19  also kept in another area, other than the cabinet in the

20  office?

21  A     Yes.

22  Q     And where was that?

23  A     Under the desk -- under the lieutenants' desk.

24  Q     I'm showing you Government Exhibit -- what's in evidence

25  as Government Exhibit 103-D.  Do you see that area in this

1   photograph?

2   A    Yes.

3   Q    And what area is it?

4   A    Like, right under the printer.

5   Q    Under this -- in this area or around here?

6   A    Yes.

7   Q    And what if anything did you learn about who put the

8   cleaning supplies there?

9   A    The lieutenant -- that Afro-American lady, her.

10  Q    Okay.  A female lieutenant who's African-American who you

11  don't remember her name.  Is that right?

12  A    Yes.

13          MS. SHIHATA:  Your Honor, may I just have a moment?

14  (Pause)

15          MS. SHIHATA:  Your Honor, may we have a quick

16  sidebar?

17          THE COURT:  Yes.

18

19

20

21

22

23

24

1    (Conference held at sidebar)

2              MS. SHIHATA:  I was just going to suggest that this

3    may be a good time to break since it's 5:50 and I'm about to

4    get into the first incident, which will take more than ten

5    minutes to complete.

6              THE COURT:  Okay.  How long do you -- I forget -- I

7    can't remember how long the trial took, it was so long ago.

8    When -- how long do you estimate the trial is going to take?

9              MS. SHIHATA:  The trial.  So I think I will finish

10   with this witness tomorrow morning.  I think -- from our

11   papers, I think we might be taking a break on Wednesday.  And

12   so --

13             THE COURT:  I don't want to bring the jury in for

14   two-and-a-half hours.  I don't think it's fair.

15             MR. RICCO:  Judge, I'm going to -- I'm going to speak

16   to the school and see if they can move Wednesday.  I'll know

17   first thing in the morning.

18             THE COURT:  Okay.  You are covering your mic.

19             MR. RICCO:  No, just bad habit, Judge.  I'm sorry.

20   I've been doing it all day.

21             MS. SHIHATA:  So I anticipate that we will be likely

22   finished with our case by Monday --

23             MS. GEDDES:  Tuesday.

24             MS. SHIHATA:  I'm sorry.  Monday is a holiday.  So by

25   Tuesday.  And then I understand that there will be a -- there

1    may be a defense case.

2              THE COURT:  Okay.  Well, does that depend on whether

3    we work on Wednesday?

4              MS. SHIHATA:  No, I think --

5              MS. GEDDES:  We have a couple -- we were relying --

6    we were relying on having Wednesday off.  So we do have several

7    out-of-town witnesses who will not be here until Thursday.  So

8    I think realistically we're going to try to see if we can move

9    things around, if you're able to sit on Wednesday, and we'll

10   see --

11             MR. RICCO:  And if I find out tonight, I'll contact

12   you tonight.

13             MS. GEDDES:  But we are somewhat limited by the

14   travel schedules that we have now pre-arranged.  But we'll do

15   our best.  But I think realistically we will finish up on

16   Tuesday.

17             THE COURT:  Okay.

18   (Conference concludes at sidebar)

19

20

21

22

23

24

25

1          THE COURT:  Okay, ladies and gentlemen.  We're going

2    to break for the day until 10:30 tomorrow.  Again, please stay

3    away from the internet as it affects this case.  Good evening.

4    (Jury exits)

5          MS. GEDDES:  Your Honor, we're starting at 10:30

6    tomorrow?

7          THE COURT:  Yes.

8          MS. GEDDES:  Okay.  Thank you.

9              (Matter Concluded)

10                 -o0o-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2       **Opening:**

3       By Ms. Shihata. . . . . . . . . . . . . . . . . . . .      9

4       By Mr. Ricco. . . . . . . . . . . . . . . . . . . . .     15

5

6       **WITNESSES:**

7       **"Maria":**

8       Direct Examination by Ms. Shihata.. . . . . . . . . . . .     19

9

10                            **E X H I B I T S**

11      **Government's Exhibit Marked For Identification:**

12      Government's Exhibit 1. . . . . . . . . . . . . . . . .

13      Government's Exhibit 3. . . . . . . . . . . . . . . . .    102

14      **Government's Exhibit Received Into Evidence:**

15      Government's Exhibit 2. . . . . . . . . . . . . . . . .     20

16      Government's Exhibit 2-A. . . . . . . . . . . . . . . .     21

17      Government's Exhibit 1. . . . . . . . . . . . . . . . .     23

18      Government's Exhibit 104-A through 104-E. . . . . . . . .     34

19      Government's Exhibit 8. . . . . . . . . . . . . . . . .     42

20      Government's Exhibit 101-A through 101-E. . . . . . . . .     43

21      Government's Exhibit 102-A through 101-G. . . . . . . . .     45

22      Government's Exhibit 3. . . . . . . . . . . . . . . . .     49

23      Government's Exhibit 9. . . . . . . . . . . . . . . . .     49

24      Government's Exhibit 103-A through 103-E. . . . . . . . .     53

25

60

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **11th** day of **February**, 2020.

*Linda Ferrara*

Linda Ferrara

AAERT CET**D 656
Transcriptions Plus II, Inc.