

U.S. Department of Justice

United States Attorney
Eastern District of New York

EMR:RAB
F.#2016R01642

271 Cadman Plaza East
Brooklyn, New York 11201

December 23, 2024

By ECF

The Honorable Ramon E. Reyes, Jr.
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Carlos Martinez
            Criminal Docket No. 17-281 (RER)

Dear Judge Reyes:

The government respectfully submits this letter in advance of defendant Carlos Martinez's resentencing, currently scheduled to take place on January 8, 2025. The defendant is appearing for resentencing after the Second Circuit affirmed the defendant's trial conviction and found on the government's appeal that the defendant's previously imposed ten-year sentence—vastly below his United States Sentencing Guidelines (the "Guidelines") range of life—was both procedurally and substantively unreasonable. (ECF No. 155, "2d Cir. Order" at 56-57). The Second Circuit held that, in imposing the ten year sentence, the sentencing court did "not fully appreciat[e] the scope and gravity of [the defendant's] criminal conduct." (2d Cir. Order at 46). For the reasons set forth below and described in the Second Circuit Order, the Court should sentence the defendant to a significant term of imprisonment in excess of 20 years.

I. Background

    A. Procedural History

        i. Charges

In May 2017, a federal grand jury returned a 20-count indictment charging the defendant with raping victim Jane Doe—who testified under the pseudonym "Maria" at trial[1]—five times across four separate encounters between December 2015 and April 2016. Specifically, the defendant was alleged to have raped Maria twice—once orally, once

---

[1]     The government hereinafter refers to the victim as "Maria."

vaginally—on December 13, 2015, and to have raped Maria vaginally on three other occasions, one sometime between December 2015 and February 2016, one in January 2016, and one in April 2016.  The charges included five counts of deprivation of civil rights, in violation of 18 U.S.C. § 242; five counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1); five counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); and five counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b)—one count under each statute for each of the five alleged rapes.  (ECF No. 1).

The indictment alleged that during the relevant period, the defendant used physical force and fear to repeatedly rape Maria, a sentenced female prisoner at the MDC.  (ECF No. 1, 142).  Maria was in her twenties and spoke minimal English.  (Retrial Tr. 23, 68).  At the time of the defendant's crimes, he was an active-duty BOP Lieutenant at the MDC with supervisory authority over other correctional officers and supervisory and disciplinary authority over inmates.  (PSR ¶ 17).  More specifically, the defendant had responsibility for: (1) operational aspects of the Correctional Department and supervision of correctional officers assigned to given areas at the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between and among officers and inmates; and (5) handling disciplinary matters.  (Id.).  The defendant also was involved in educating MDC staff regarding protocols and related requirements of the Prison Rape Elimination Act, a federal statute that, among other things, was meant to implement standards for the prevention, detection, and punishment of prison rape.  (Id.); see also 34 U.S.C § 30302 (describing purposes of Prison Rape Elimination Act).  In short, the defendant was a person with substantial authority and control over the lives of inmates and the careers of staff at the MDC.

   ii. <u>Trial History</u>

Two trials took place prior to the initial sentencing.  Jury selection for the first trial took place on January 8, 2018.  Trial commenced immediately thereafter and concluded two weeks later, on January 19, 2018.  After hearing testimony from more than a dozen witnesses, including from Maria, Maria's fellow inmates, and BOP employees, the jury rendered a verdict of guilty on all counts.  (ECF No. 85).

Following the first trial, the government learned that it had inadvertently failed to provide the defendant with a memorandum of an interview (the "Interview Report") of an individual (hereinafter, "Yolanda")[2] who was a victim-witness in a separate criminal matter in which another MDC officer was charged with sexual abuse.  Yolanda did not testify at the defendant's first trial, but she had known Maria at the MDC.  The Interview Report contained statements by Yolanda that, in substance, Maria had told Yolanda that "something was going on between [Maria] and Lieutenant Martinez"; that in one instance another inmate and Yolanda had offered to go with Maria to clean the lieutenant's office (which was where the rapes took place),

---

[2]  This individual testified at the defendant's retrial under the pseudonym "Yolanda" and is referred to as such herein.

2

but that Maria had declined and said she would go alone; and that Maria had declined medical tests because of her relations with the defendant. (ECF No. 84 at 32).

On November 30, 2018, the defendant moved pursuant to Federal Rule of Criminal Procedure 33 for a new trial on the ground that the Interview Report contained exculpatory Brady material, as defined in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. (ECF No. 83). The government opposed the motion for a new trial. (ECF No. 84). The district court found that the statements contained in the Interview Report could support a defense theory that Maria "pursued" the defendant. (ECF No. 86 at 10). Accordingly, on June 24, 2019, the court granted the defendant's motion for a new trial on all counts except for the five counts of conviction that were based on sexual abuse of a ward, as "consent" was not relevant to those counts. (ECF No. 86 at 17).

The operative indictment during the retrial was redacted to remove the five counts of sexual abuse of a ward that were upheld following the Rule 33 litigation, and the remaining fifteen counts were renumbered. The following chart reflects the count number in the original indictment, the revised count number (where applicable) in the redacted indictment used during the retrial, and the final verdict on each count.

| Indictment | Redacted Indictment | Verdict |
|---|---|---|
| One (Deprivation of Civil Rights) | One | Not Guilty |
| Two (Aggravated Sexual Abuse) | Two | Not Guilty |
| Three (Sexual Abuse) | Three | **Guilty** |
| Four (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Five (Deprivation of Civil Rights) | Four | **Guilty** |
| Six (Aggravated Sexual Abuse) | Five | **Guilty** |
| Seven (Sexual Abuse) | Six | **Guilty** |
| Eight (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Nine (Deprivation of Civil Rights) | Seven | Not Guilty |
| Ten (Aggravated Sexual Abuse) | Eight | Not Guilty |
| Eleven (Sexual Abuse) | Nine | **Guilty** |
| Twelve (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Thirteen (Deprivation of Civil Rights) | Ten | Not Guilty |

3

| Indictment | Redacted Indictment | Verdict |
|---|---|---|
| Fourteen (Aggravated Sexual Abuse) | Eleven | Not Guilty |
| Fifteen (Sexual Abuse) | Twelve | **Guilty** |
| Sixteen (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |
| Seventeen (Deprivation of Civil Rights) | Thirteen | Not Guilty |
| Eighteen (Aggravated Sexual Abuse) | Fourteen | Not Guilty |
| Nineteen (Sexual Abuse) | Fifteen | **Guilty** |
| Twenty (Sexual Abuse of a Ward) | [Not included] | **Guilty** (first trial) |

(Compare ECF No. 1, with ECF No. 106-1; see also ECF No. 142).

      Jury selection for the retrial took place on February 10, 2020, and trial commenced immediately thereafter. More than a dozen witnesses testified, including Maria, several of Maria's fellow inmates, Yolanda, and BOP employees. The defendant testified in his defense and, perhaps in light of the convictions for sexual abuse of a ward that remained in place from the first trial, he admitted that he had sex with Maria in the lieutenant's office at the MDC on certain occasions. (Retrial Tr. 674-75). The defendant maintained that these sexual encounters were consensual.[3] (Retrial Tr. 676-77).

      On February 20, 2020, the jury rendered a verdict of guilty on seven of the fifteen counts on which the defendant was retried (as set forth in the chart, supra at 3-4), convicting the defendant of raping Maria on each of the occasions charged in the indictment. (See ECF No. 142). Specifically, the jury convicted the defendant of depriving Maria of her civil rights (Count Four), raping Maria by force (Count Five), and raping Maria by fear or threat (Count Six) with respect to the vaginal rape on December 13, 2015; raping Maria by fear or threat with respect to the oral contact on December 13, 2015 (Count Three); and raping Maria by fear or threat with respect to the sexual assaults committed on the three other occasions alleged in the indictment— one between December 2015 and February 2016 (Count Nine), another in January 2016 (Count Twelve), and another in April 2016 (Count Fifteen).[4] (See ECF No. 142). The jury acquitted the

---

[3]    The defendant did not testify at the first trial and did not at that time admit his guilt with respect to the five counts of sexual abuse of a ward.

[4]    The count numbering used here corresponds to the counts alleged in the redacted indictment used during the second trial.

defendant on the civil rights and forcible rape charges related to the latter four incidents.[5]  (See ECF No. 142).

### iii. Sentencing

Following the defendant's conviction, the United States Probation Office (the "Probation Office") prepared a presentence investigation report ("PSR") that addressed the five convictions of sexual abuse of a ward from the first trial and the seven convictions of, variously, aggravated sexual abuse, deprivation of rights, and sexual abuse by threat or fear from the second trial.  (PSR ¶¶ 1-15).  The Probation Office calculated a total adjusted offense level of 46, which, coupled with the defendant's criminal history category of I, resulted in an advisory Guidelines range of life in prison.   (PSR ¶¶ 108, 112, 151).

The government recommended that the district court sentence the defendant to a significant term of imprisonment in excess of 20 years based on the nature, circumstances, and seriousness of the offense; the defendant's history and characteristics; and the need to promote respect for the law, provide just punishment, and provide both specific and general deterrence. (ECF No. 121).  The defendant requested a sentence of time served (at the time, 52 months) or no greater than 60 months' imprisonment, arguing, among other things, that he and Maria had "a consensual affair, a secret relationship that we both agreed on," and that he "never forced, demanded, [or] threatened" Maria.  (ECF Nos. 129, 131).

On April 13, 2022, the district court conducted a sentencing proceeding.  The court found that the applicable Guidelines range was life but imposed a sentence of ten years' imprisonment.  (ECF No. 142).  In explaining the sentence, the court adopted much of the reasoning behind the defendant's defense theory, essentially concluding, despite the jury's verdict finding sexual abuse, aggravated sexual abuse, and deprivation of civil rights, that Maria had consented to a sexual relationship with the defendant.

Shortly after the district court imposed its sentence, the Probation Office distributed a revised PSR (the "Post-Sentencing PSR").  The Post-Sentencing PSR had a number of changes from the original 2020 PSR.  The Post-Sentencing PSR included the following paragraph:

---

[5] Following his conviction, the defendant has repeatedly falsely asserted that the jury verdict "affirmed, in substantial part, the sworn testimony of [the defendant], that his sexual contact with [Maria] was not unwanted."  (2d Cir. 22-209, "Def. Appeal Br.," Dkt No. 53 at 4).  The defendant was convicted of sexual abuse in connection with every single charged incident. Sexual abuse in violation of 18 U.S.C. § 2242(1) makes it a crime to knowingly "cause[] another person to engage in a sexual act <u>by threatening</u> or <u>placing that other person in fear</u> (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)."  (emphasis added)  Sexual abuse is <u>not</u> voluntary or "wanted" sexual contact.  It is rape.  It is simply rape inflicted without the use of physical force.

> Per the Court's directive, the presentence report is amended to reflect particular findings made by the jury in the instant case. Specifically, during the trial, the jury found many aspects of the victim's testimony about the circumstances under which she had sexual intercourse with the defendant not credible. Although the victim testified that on at least four separate occasions she was forcibly raped, the jury rejected her testimony as to all of those occasions except one, which occurred on December 13, 2015. Furthermore, while the jury did convict the defendant on all counts of sexual abuse, the elements of which required that the victim's consent was induced by threats or fear, the victim did not testify that she consented to have sexual intercourse with the defendant because of threats or fear. She instead testified that each occasion was brought about by force.

(Post-Sentencing PSR ¶ 22). Additionally, the Post-Sentencing PSR replaced the terms "rape" and "forcible penetration" with "aggravated sexual abuse," "sexual intercourse," "sexual contact," and "to have sex." (Compare PSR ¶¶ 21-23, with Post-Sentencing PSR ¶¶ 19-21).[6]

      iv.    Appeal

On November 15, 2022, the defendant filed an appeal challenging the sufficiency of the evidence presented at trial with respect to Counts Four (deprivation of civil rights) and Five (aggravated sexual abuse). (Def. Appeal Br.). On February 15, 2023, the government filed its opposition to the defendant's appeal and cross-appealed challenging both the procedural and substantive reasonableness of the defendant's ten-year term of incarceration. (2d Cir. 22-209, "Gov't Appeal Br.," Dkt No. 83). Specifically, the government argued that the ten-year sentence imposed by the district court was both procedurally and substantively unreasonable because it was based on a factually incorrect and legally unsupportable view of the record and jury verdict. (Gov't Appeal Br. at 4). The jury's verdict reflects that it found that the defendant raped Maria five times, including once by physical force and threats or fear and four additional times through the use of threats or fear, and that each of these five rapes also qualified as sexual abuse of a ward. (See ECF No. 108). The government argued that the district court disregarded the jury's findings and sentenced the defendant as if Maria had consented to the five sexual encounters at issue and the defendant had only committed sexual abuse of a ward. (Gov't Appeal Br. at 4-5). Because the sentencing court based the defendant's sentence on a theory of the case that was inconsistent with facts necessary to the jury's verdict, the government argued that the sentence

---

[6] Based on the Second Circuit's decision, the government respectfully requests that the Court use at resentencing the original PSR and not the Post-Sentencing PSR. As discussed below, the Second Circuit expressly struck paragraph 22, quoted above, from the Post-Sentencing PSR. In addition, the government respectfully submits that the language used in the original PSR is appropriate in light of the jury's findings.

6

should be vacated and the case remanded for resentencing. (Gov't Appeal Br. at 4-5). The Second Circuit agreed.

Oral argument was held on January 8, 2024. On July 30, 2024, the Second Circuit issued a 57 page decision affirming the conviction, ordering paragraph 22 of the Post-Sentencing PSR (quoted above) be stricken, and remanding for resentencing due to the procedural and substantive unreasonableness of the defendant's ten-year sentence.

  B.  The Offense Conduct

The charged conduct spanned a period of five months from December 2015 to April 2016. (PSR ¶¶ 4-17). During this time period, the defendant used physical force and fear to repeatedly rape Maria, a sentenced female prisoner at the MDC. At the time of the defendant's crimes, he was an active-duty United States Bureau of Prisons Lieutenant at the MDC, with supervisory authority over other correctional officers and supervisory and disciplinary authority over inmates. (PSR ¶ 17). According to his performance reviews, the defendant was also involved in educating MDC staff regarding the Prison Rape Elimination Act protocols and incidents. (Id.).

While serving as a lieutenant at the MDC, the defendant regularly directed Maria and other female inmates to clean areas on the second floor of the MDC's East Building, including the lieutenants' office and surrounding areas. (PSR ¶ 18). Maria first began to clean for the defendant in or about September 2015. (Retrial Tr. 51). Initially, the defendant was friendly to Maria and told Maria information about his family and where he lived. (Id. at 63-64). He referred to Maria by her first name, which she found unusual, since MDC staff generally referred to prisoners by their last names. (Id. at 64). Thereafter, the defendant began making comments to Maria that made her uncomfortable. Specifically, his overtly inappropriate behavior commenced when he began making sexually explicit comments to Maria, including asking Maria how she "satisfied" herself and suggesting that she masturbate while thinking of him. (Id. at 65-66; PSR ¶ 18). At the time, Maria was an inmate in her 20s, who spoke minimal English. (Retrial Tr. 23, 68; PSR ¶ 18). The defendant, a former marine, was in his late 40s and communicated with Maria in Spanish, his second language. (PSR ¶ 18). These comments were unwanted by Maria and made her feel ashamed and embarrassed.

In early December 2015, the defendant's behavior escalated to serious, violent criminal conduct. (Id. ¶ 19). Specifically, while Maria prepared to clean the lieutenants' office area on a weekend,[7] the defendant exposed his erect penis through the zipper of his pants and then forcibly grabbed the back of Maria's head with his hands and pulled her head towards his penis to insert his penis into Maria's mouth. (Id.). Maria attempted to push herself away, but the defendant ultimately was able to insert his penis into her mouth. (Id.). Thereafter, the defendant forcefully lifted Maria up, pinned the top portion of her body against the top of a desk, pulled Maria's pants and underwear down and penetrated Maria's vagina with his penis from behind, roughly thrusting his penis inside Maria multiple times. (Id.). As this occurred, Maria was

---

[7] The trial testimony established that on Friday afternoons and weekends, the second floor of the MDC's East Building was generally empty.

crying, but the defendant did not stop. The defendant ultimately ejaculated inside of Maria and his actions caused Maria to bleed from her vagina. (Id.).

Put simply, the defendant used his superior position, authority, and strength, to overpower and rape Maria, a petite female prisoner under his control and care. The defendant did not use a condom when he raped Maria, leaving her terrified that, among other things, she would get pregnant. (Id. ¶ 20). Maria begged the defendant to bring her a morning-after pill. The defendant assured Maria that she would not get pregnant because he had undergone a vasectomy, rendering him incapable of impregnating others. (Id.). Medical records confirm that the defendant underwent a vasectomy in 2013. (Id.). Eventually, after Maria continued to cry and beg, the defendant agreed to bring her a morning-after pill later, around midnight. Before allowing Maria to return to the unit where she was housed, the defendant warned Maria not to tell anyone what had happened, telling her that she could receive additional time in prison if anyone found out. (Id.).

After returning to her housing unit, Maria was upset and distraught and still bleeding from her vagina. (Retrial Tr. 82, 87). She confided parts of what occurred with the defendant to three other inmates – Kiara Maldonado, Danilda Lora, and Melva Vasquez – including that the defendant "penetrated" her, but did not provide them with the full details of what transpired. Kiara Maldonado and Danilda Lora initially reacted in a manner that upset Maria further, indicating that she should be happy and that it was not a big deal.

Thereafter, at approximately 12:30 am, the defendant came to Maria's housing unit, gestured to her to come to him, and handed Maria a copy of her ID with the morning-after pill hidden inside, which pill she thereafter took while in the bathroom. (Retrial Tr. 80-81, 95-97). Maria saved the packaging of the morning-after pill after taking it in order to show the packaging to Danilda Lora, who reads and speaks English, when Lora returned from kitchen duty later that morning, to confirm that the pill was, in fact, the morning-after pill. (Retrial Tr. 97-98). After Lora confirmed that the packaging was for the morning-after pill, Maria got rid of the packaging because items from outside of the prison are considered contraband. (Retrial Tr. 99-100).

Following this initial rape, the defendant continued to rape Maria repeatedly in the lieutenants' office in the months that followed. (Id. ¶ 21). Maria does not recall the exact number of times this occurred, but estimates that the defendant raped her at least 10 times, including an occasion in January 2016 (Counts Nine through Twelve in the Original Indictment), an occasion in February 2016 (Counts Thirteen through Sixteen in the Original Indictment) and an occasion in April 2016 (Counts Seventeen through Twenty in the Original Indictment). (Id.). During each of these incidents, the defendant vaginally penetrated Maria with his penis from behind. Throughout this period, the defendant also made clear to Maria that he knew details about her familial circumstances and the fact that she rarely, if ever, received visitors at the MDC. (Id.). The defendant also provided Maria with his email address, which began with "CarlosRichMartinez," and told Maria that he would be "different" once she was out of prison and that she should contact him. (Retrial Tr. 121-22). In or about February 2016, the defendant learned that Maria made a phone call to a friend in which she, inter alia, mentioned the defendant's name in a context that could bring scrutiny to the inappropriate nature of his contact with Maria. (PSR ¶ 22). Specifically, Maria called her friend and asked her to look the defendant up on Facebook using the name from his email address, "CarlosRichMartinez." Maria

8

made this call knowing that the call was recorded and hoping that the defendant would hear it so he would leave Maria alone and stop raping her. The defendant then angrily confronted Maria about the phone call and, among other things, (1) warned Maria that an investigation could follow, which would result in her receiving an additional, significant prison sentence, and (2) admonished Maria to lie to investigators if they spoke to her. (Id.). Thereafter, the defendant ceased calling on Maria to clean the second floor for him and ceased raping Maria, until in or about April 2016. (Id.).

In or about April 2016, shortly before Maria was scheduled to be released from the custody of the Bureau of Prisons to the custody of Immigration and Customs Enforcement ("ICE"), the defendant again sought Maria's assistance in cleaning the lieutenants' office area and used that opportunity to forcibly penetrate Maria's vagina with his penis one last time before she left the MDC. (Id. ¶ 23). On this final occasion, the defendant ejaculated on Maria's lower back, stating, in substance and in part, that he did so in case "immigration" were to "check" her medically. (Id.).

During the multiple rapes, the defendant used the computer on his desk to access video surveillance camera footage of various areas in the MDC to ensure that no one was coming and that his conduct would remain undetected. (Retrial Tr. 102).

II.     The Sentencing Guidelines

The government agrees with Probation that the defendant's Guidelines range is life imprisonment. (PSR ¶¶ 108, 112, 151).

III.    Discussion

The government respectfully submits that, in this case, a sentence of a significant term of imprisonment in excess of 20 years is appropriate in light of all relevant factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

A. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

### B. A Significant Sentence of Imprisonment Is Appropriate In This Case

Based on the factors set forth in 18 U.S.C. § 3553(a), a significant sentence of imprisonment—one in excess of 20 years—is appropriate in this case.

The nature and circumstances of the offenses and the defendant's history and characteristics warrant a significant sentence of imprisonment. The nature and circumstances of the instant offenses, see 18 U.S.C. § 3553(a)(1), are extremely serious. The defendant committed the instant offenses as a sworn law enforcement officer. The defendant committed his crimes in a particularly brazen fashion in the lieutenants' office in the East Building of the MDC, while he was the East Activities Lieutenant on duty, responsible for the safety and security of all those housed there, including his victim and other staff. His outrageous conduct evinces a belief that he was above the law and could act with impunity. While the defendant has no prior criminal history, the breadth and sustained nature of the defendant's criminal acts—committed on multiple occasions and over several months—demonstrate that these crimes were in no way aberrational or simply the result of a momentary lapse in judgment. His crimes were the result of conscious choices made repeatedly by a man in his late 40s who simply did not believe he would get caught or be prosecuted for his crimes.

The impact of the defendant's crimes on Maria have also been severe. During her trial testimony at the first trial, Maria described how she felt after the first incident in December 2015, when the defendant forced her to give him oral sex and vaginally raped her: "It's the worst thing that ever happened to me. It killed me inside." (First Trial Tr. 107). The defendant, on the other hand, noting that Maria was bleeding, joked, "that's what happens . . . I turned a girl into a woman," treating the worst thing that happened to Maria "like it was nothing." (First Trial Tr. 108). After the subsequent rapes, Maria continued to feel "[p]owerless," "miserable," and "horrible." (First Trial Tr. 149, 178). As Maria testified, the defendant's crimes "continue to affect me and they will always affect me. I don't think I'll be able to get over that." (First Trial Tr. 237). Indeed, the lasting effect the defendant's crimes have had on Maria was palpable during her testimony at trial, where she had to relive these horrendous experiences by recounting to the jury in a public courtroom the graphic details of what the defendant did to her. At the second trial, Maria made clear that she continues to be haunted by the defendant's crimes and there is little doubt that she will continue to endure this trauma for the remainder of her life.[8] While Maria committed a crime of her own, she deserved the right to serve her time in federal prison without having her civil rights or her body violated by a lieutenant whose job it was to

---

[8] Maria submitted victim impact statements after each of the defendant's two trials, which have been translated from Spanish to English and are attached hereto as Exhibit A. An additional victim impact statement was submitted by the then-warden of the MDC. (See ECF No. 124).

10

protect her. The sentence imposed by the Court must provide just punishment for the serious, lasting harm the defendant has caused to Maria. (See Ex. A at 1 ("Martinez stole from me my happiness, courage, sense of safety, my joy, and my confidence forever, but above all my love for life itself. . . ."); id. ("Although I realize that I am not only a victim, that it's just one page in the book of my life, it's a page I would like to rip out of my soul."); id. at 7 ("Martinez destroyed my soul, he dirtied my life leaving a stain on my body that can never ever be removed.")).

On a much lesser level, the defendant's actions during a March 2016 road rage incident, (PSR ¶ 110), provide another example of the defendant's disregard for others, his belief that he is above the law, and his willingness to lie when it serves his interest. In the road rage incident, the defendant brazenly punched a woman and destroyed the side-view mirror of her car, and then when confronted months later, incredibly claimed for the first time that he was simply acting in self-defense. At the second trial, when the defendant took the stand and testified on his own behalf, the defendant repeatedly lied—both about the March 2016 road rage incident and his repeated rapes of Maria. The sentence imposed by the Court should reflect the defendant's utter lack of remorse.

Finally, the sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). A significant sentence is warranted in light of both of these considerations.

General deterrence is of particular concern in this case. A significant sentence is warranted to ensure that federal correctional officers, particularly those that work at the MDC, know that they will not only be prosecuted, but will receive lengthy prison sentences, should they choose to sexually victimize inmates in their custody and care by engaging in such serious and egregious criminal conduct.

Specific deterrence is also a significant concern in this case. While the defendant will no longer have the opportunity to sexually abuse, assault, and rape inmates entrusted to his care, the brazen manner in which the defendant committed his crimes suggests that he will commit other crimes, unless deterred from doing so by a significant sentence, which will also protect the public from further crimes by this defendant. Specific deterrence is a particular concern here where the defendant has made clear that he continues to believe he is above the law and has no remorse or understanding of the gravity of his criminal actions. For years following his conviction and to this day, the defendant has continued to falsely assert that he merely had a consensual sexual relationship with Maria. In his September 22, 2024 personal letter to the Court, the defendant described his conduct as "having a sexual relationship with a prisoner." (ECF No. 157 at 2).[9] The defendant did not have a "sexual relationship" with a prisoner. He

---

[9] The defendant also alleges in his September 22, 2024 letter that prior to sentencing he spent five years and two months in solitary confinement at Essex County Correctional Facility and that the experience there was the "worst period of time in [his] life" and "traumatic." (ECF No. 157 at 1). It is notable that when the defendant was brought back to New York for resentencing, his counsel specifically requested that he return to Essex because the defendant had a positive experience there. Moreover, based on a conferral with a supervising

raped a prisoner who was helpless to defend herself while she was subject to his authority and in his care. The defendant continues to display an inability to grasp the severity of his crimes, a refusal to accept any real responsibility, and an inability to appreciate the severe harm he caused.

Given the defendant's serious, sustained criminal conduct committed as a supervisory federal law enforcement officer, which involved the repeated sexual victimization of a sentenced federal prisoner in the defendant's custody and care, a significant sentence of imprisonment in excess of 20 years is appropriate.

### IV. Conclusion

For the foregoing reasons, the Court should sentence the defendant to a significant sentence of imprisonment in excess of 20 years.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Rachel A. Bennek
Assistant U.S. Attorney
(718) 254-6140

cc: Clerk of Court (RER) (by ECF)
Anthony Ricco, Esq. (by ECF and E-mail)
U.S. Probation Officer Patricia A. Sullivan (by E-mail)

---

officer at Essex, the government understands that, though the defendant was placed in protective custody, he would have been permitted out of his cell for at least two-and-a-half hours in the morning and two-and-a-half hours in the afternoon. Further, the defendant had a job assignment, which would have resulted in him being out of his cell most of the day.